# In re Arthur J. O'Dea

[622 A.2d 507]

No. 92-196

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed February 11, 1993

*Lawrence Miller* and *Sarah M. Powell* of *Miller & Faignant, P.C.*, Rutland, for Respondent.

*Charles E. Finberg* of *Paul, Frank & Collins, Inc.*, Burlington, for the Judicial Conduct Board.

**Per Curiam.** Superior Judge Arthur J. O'Dea (respondent) appeals a recommendation of the Judicial Conduct Board that he be publicly reprimanded for violating Canon 3A(3) of the Code of Judicial Conduct. We concur with the Board's recommendation, and add the further sanction that Judge O'Dea be suspended from presiding in family court for a period of two years.

I.

The Judicial Conduct Board investigated three complaints brought separately against respondent, each charging that he lacked patience, dignity, or courtesy to litigants, witnesses, and attorneys in his courtroom, violations of Canon 3A(3) of the Code of Judicial Conduct.[1] These complaints involved three contested cases, respectively *Graf v. Graf, Greene v. Bordulis,*

---

[1] Canon 3A(3) of the Code of Judicial Conduct states that "[a] judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, and should require similar conduct of lawyers, and of his staff, court officials, and others subject to his direction and control."

and *Georges v. Morris.* The Board also investigated whether there was a recurring pattern of judicial misconduct with regard to Canon 3A(3), examining and incorporating into the record transcripts from an additional five cases.

All of the cases included in the record involved instances of temperamental behavior by respondent during family court proceedings. In *Greene*, the transcript shows that he addressed the attorneys and litigants in an extremely impatient and discourteous manner, referring to the proceedings as "garbage" and "a waste of time," and indicating before hearing the evidence that he would summarily dismiss the parties' motions. He also described the litigants as "acting like animals."

In *Georges*, which concerned a visitation dispute, respondent exhibited similar impatience and discourtesy. He refused to grant a continuance so that the litigant mother could obtain counsel, although she had appeared at the court expecting the matter to be mediated or continued. He cut off the mother's attempt to briefly cross-examine the father, gave her no opportunity to present testimony or evidence of her own, and questioned in a harsh and intimidating fashion the parties' daughter, who was not a party or sworn as a witness. When the mother began to comfort her daughter, who had begun to cry, he directed the mother to "just leave her alone and let her listen." He also threatened to transfer custody of the daughter to the father if the parties did not adhere to a visitation schedule, although the father neither requested nor wanted such a transfer. Respondent directed the parties to agree to a visitation schedule during a recess, which the mother, feeling powerless to object, signed with the notation that she was agreeing "under duress of the court's order."

After its preliminary investigation, the Board issued a formal complaint, which expressly stated the Board's intention to consider the transcripts from all eight cases but charged violations of the canon in only the first three matters. The Board eventually dismissed the *Graf* complaint because respondent had apologized to the parties for his behavior on the following morning.

During the period between the issuance of the formal complaint and commencement of the hearing before the Board, respondent, his attorney, and counsel for the Board entered into a "Stipulation to Findings and Recommendation," dated October

25, 1991. In that document, the parties agreed to recommend to the Board that it, in turn, recommend that this Court impose no greater sanction than a public reprimand on respondent.[2] Further, respondent acknowledged the accuracy of the transcripts in all eight cases identified in the formal complaint and stipulated they would be part of the record. The parties agreed that "a charge of a pattern of recurring conduct is not being made against Judge O'Dea with regard to the transcripts of the [five additional] proceedings," but that respondent "shall be allowed and be permitted to present his explanations of the events, to call witnesses, and present other evidence in response thereto."

The stipulation also included statements by respondent concerning the charged inappropriate behavior. He stated that he had "addressed and recognized the inappropriateness" of his conduct in *Greene* and assured the Board that it would not recur. He also stated that he had not intended discourtesy in *Georges* but "appreciates how Mrs. Georges could have misunderstood his intentions." Finally, the stipulation provided that respondent was to have the opportunity to appear personally before the Board and "present such further evidence and argument" as he wished on his behalf.

Respondent appeared before the Board on October 25, 1991 (the date of the stipulation) and January 9, 1992; one of the complainants, Salina Rain (formerly Georges), testified at the January hearing. At the October 25th hearing, respondent testified in detail about his actions in the two cases. He also stated his belief that the only inappropriate aspect of his conduct in the *Greene* case was his use of the word "animals," and denied any misconduct in connection with *Georges*. With regard to the stipulation, respondent stated that he understood he was not being charged with a separate count of a pattern of misconduct

---

[2] At oral argument, both parties claimed that the stipulation was binding on the Board and limited its recommendation to, at most, a public reprimand. The instrument itself clearly does no such thing. First, the Board was not a party to the agreement, and the stipulation on sanction specifically binds only the "signatories." Even if its counsel was empowered to bind the Board in such an agreement, however, the language of the stipulation plainly shows that the signatories agreed only "to request and recommend that the Judicial Conduct Board recommend no greater sanction than a reprimand of Judge O'Dea."

but rather "whether there's a pattern of that particular conduct, impatience, indignity, discourtesy, and if there is, then it would reflect only upon [the *Greene* and *Georges*] charges." The transcripts of all eight proceedings were then entered into evidence.

On April 14, 1992, the Board filed a final order of recommendation with this Court, dismissing the *Graf* complaint, finding violations of Canon 3A(3) for *Greene* and *Georges*, and recommending a public reprimand as sanction for those two violations. This recommendation was signed by five members of the Board, but included the signature of one, Lola Aiken, who had not attended all the hearings. As added support for its recommended sanction, the Board found by clear and convincing evidence that, despite the text of the stipulation, respondent failed to recognize that "his conduct generally, not simply one ill-chosen word, reflected impatience, discourtesy and lack of dignity."

On May 13, 1992, respondent filed a response, stating that he was not going to contest the Board's proceedings or its decision. He requested, however, that the Board reverse its decision and dismiss the charges or recommend only a private reprimand, and contended that the Board had insufficiently recognized his remorse in the *Greene* case. He also argued that the Board was penalizing him for a pattern of misconduct, although it had agreed not to do so. The Board responded with a memo stating that it had, in accordance with the stipulation, considered all of the cases in evidence for the purpose of determining the severity of the charged incidents, and had recommended a sanction on that basis.

On June 10, 1992, respondent filed in this Court a motion to vacate the Board's recommendation and remand for a new hearing. He argued that the recommendation was defective under Rule 6(17) of the Rules of the Supreme Court for Disciplinary Control of Judges, which requires the concurrence of five members of the Board to validate its recommendations. He argued that the fifth signer, Lola Aiken, was disqualified to sign because she had not attended all of the hearings. He also argued that the Board had violated the stipulation by its reference to the uncharged cases. On June 22, the Board reissued its recommendation, signed also by the two additional members. Those members also filed a "confirmation" of the final order,

indicating that they concurred. On June 30, 1992, respondent filed a notice of appeal.[3]

## II.

Respondent argues that this matter should be remanded to the Board for a new hearing or, alternatively, dismissed altogether, because the proceedings below violated due process. He relies on this Court's recent opinion in *In re Illuzzi*, 159 Vt. 155, 158, 616 A.2d 233, 235 (1992), for the proposition that the Board must strictly adhere to the procedural rules that govern it. He details seven specific procedural "errors" to support this claim.

Before examining the alleged errors, it is important to note that this Court makes the *only* final and ultimate decision in a judicial conduct proceeding; the findings and recommendations of the Judicial Conduct Board carry great weight but are not binding. Consequently, it is not the function of this Court to review the actions of the Board in matters of this kind. See *In re Hill*, 152 Vt. 548, 555–56, 568 A.2d 361, 365 (1989). Thus, the presence of procedural errors by the Board will not affect our consideration of a judicial misconduct case unless, as was true in *Illuzzi*, the errors actually prejudiced respondent. See *id.* at 559, 568 A.2d at 367. We emphasize that proceedings before the Judicial Conduct Board must be conducted so as to afford the respondent procedural due process of law. See, e.g., *In re Deming*, 736 P.2d 639, 650, *amended*, 744 P.2d 340 (Wash. 1987). The question before us is whether any of the alleged errors, if they are errors at all, rise to the level of a due process violation.

First, respondent claims that the Board violated Rule 6(17) of the Rules of the Supreme Court for Disciplinary Control of Judges (Rules) when it issued its April 14 final recommendation because only four qualified members signed the recommendation. He contends that the six members whose names now appear on the final recommendation have "at no time . . . assented in synchrony" to the final order, and that no valid quorum existed for the Board's action. He does not directly contend,

---

[3] Although a question was raised regarding the timeliness of respondent's notice of appeal, both parties agree, albeit for different reasons, that the appeal is procedurally valid. We find that the notice was timely filed and will reach the merits of respondent's appeal.

however, that the Board members (excepting Lola Aiken) who signed the final recommendation were not present at all of the hearings or did not participate in the deliberations. Thus, there existed a quorum for the making of findings and the formulation of a recommendation.

We find no requirement in Rule 6(17) that the members sign the recommendation simultaneously. The Board, which is not a full-time entity, has pointed out the logistical difficulties that may arise in securing the attendance of all its members at each meeting. We must interpret the Rules consistent with a realistic appraisal of the functioning of this voluntary, part-time body. See *Herald Association v. Judicial Conduct Board*, 149 Vt. 233, 237, 544 A.2d 596, 599 (1988). A requirement of a ritualistic simultaneous signing of the final order would be impractical. Even if the final order that was presented to the final two Board members for signature was "something other than a valid opinion of the Board," it became one after the members affixed their signatures. Especially because respondent has raised this as a due process issue, the crucial question is whether this Court has been properly informed that the final recommendation actually reflects the views of the Board. The current list of signatures demonstrates to our satisfaction that the required minimum number of Board members concurs in the final order. This procedural detail has now been satisfactorily corrected, and respondent has suffered no prejudice as a result of the process.

Second, respondent argues that the Board violated Rule 9(3) because it excessively delayed its issuance of the final order and this violation deprived the Board of jurisdiction. The rule states that the Board's order shall be issued within thirty days of the receipt of the disposition report from a panel of the Board. Because there was no panel in this case, and therefore no disposition report, respondent contends that the thirty days began running from the date of the last hearing, which was in January.

We agree that the decision in this case was delayed beyond the period contemplated in the Rules, although no rule technically applies. Where fact-finding is done by a panel, Rule 9(1) requires the panel to report to the Board within thirty days,

and Rule 9(3) requires the Board to issue its final recommendation to this Court within thirty days. Where no panel is used, the consistent time requirement is for the Board to act within sixty days, which it failed to do here.[4]

We do not agree, however, that the consequence of going beyond the decisional time limits of the Rules is a loss of jurisdiction. We have consistently held otherwise in comparable contexts, unless the Legislature has specifically provided that consequence. See *Coleman v. United Parcel Service*, 155 Vt. 646, 646, 582 A.2d 151, 152 (1990) (mem.) (delay in issuing workers' compensation decision); *Hinsdale v. Village of Essex Junction*, 153 Vt. 618, 623, 572 A.2d 925, 928 (1990) (delay in giving notice of a zoning decision); *In re J.R.*, 153 Vt. 85, 92–93, 570 A.2d 154, 157–58 (1989) (delay in holding disposition hearing after CHINS finding). These decisions are based upon the "generally well-accepted law that '[a] statutory time period is not mandatory unless it *both* expressly requires an agency or public official to act within a particular time period *and* specifies a consequence for failure to comply with the provision.'" *In re Mullestein*, 148 Vt. 170, 173–74, 531 A.2d 890, 892 (1987) (quoting *Thomas v. Barry*, 729 F.2d 1469, 1470 n.5 (D.C. Cir. 1984) (emphasis added)). We have provided no consequence in Rule 9(3) for a failure to comply with time limits. As strongly as we believe timely action is necessary in judicial conduct proceedings, we believe it would be inappropriate to exonerate a judge of serious misconduct charges simply because the voluntary, part-time Board took too long to render a decision. Thus, the rule is governed by the doctrine set out in *Mullestein* and must be considered directory, not mandatory.

Although respondent admits that there is no precedent directly supporting his view, he relies on *Illuzzi* to support his claim for strict compliance with time limits. We have held that excessive delay can amount to a due process violation only if the

---

[4] The extent of the delay was not great. The first decision was dated March 27, 1992, fewer than eighty days after the last hearing. Respondent counts as delay the time after the first decision when the signatures of the additional Board members were obtained. We disagree with this characterization because respondent was fully aware of the Board's decision after it was first issued, and the additional members simply confirmed that they had voted for it.

delay causes substantial prejudice. *State v. Dean*, 148 Vt. 510, 514, 536 A.2d 909, 912 (1987). Respondent has not claimed that the delay in this case prejudiced him in any way, only that it was one of the procedural defects that, "taken as a whole," denied him due process. We find that the situation was resolved with no prejudice resulting to respondent, and that the delay created no error that requires a new hearing.

Respondent next argues that the Board improperly disregarded the stipulation restricting its discretion to consider evidence of a pattern of misconduct or to reject his expression of remorse. The stipulation provided, in part, that "the parties . . . agree that a charge of a pattern of recurring conduct is not being made against Judge O'Dea with regard to the transcripts of" the five additional cases. Respondent claims that this provision was intended to limit the Board's power to *consider* a pattern of misconduct, and that he relied on this understanding in waiving his opportunity to call additional witnesses to refute the existence of such a pattern.

We find no support for respondent's contention that the Board deviated from the terms of the agreement. The stipulation contains provisions which made, or should have made, him aware of the Board's intention of using the transcripts of the additional cases. Particularly relevant is Paragraph 4, which contains his agreement that the transcripts of all seven cases (excluding *Graf*) are true and accurate, and provides that all of them are "attached hereto and fully incorporated by reference." Further, his counsel accepted an explanation from the Board at the October 25 hearing regarding the incorporation of the transcripts into the record. The Board's chairman indicated to counsel that although no charge of a pattern of misconduct was being made, the transcripts of the additional cases would be part of the Board's considerations in reaching conclusions as to the charged cases.

The transcript of respondent's October 25, 1991 testimony before the Board supports the Board's contention that he was well aware of the way the noncharged cases would be used. He stated that "these other allegations were included in the Complaint and are now included in the Complaint to serve the mission of the Conduct Board, which is to determine [with regard to the three charged cases] whether there's a pattern of that

particular conduct, impatience, indignity, discourtesy, and if there is, then it would reflect only upon those charges." The Board, by agreeing not to charge respondent with a pattern of misconduct, did not waive consideration of the transcripts from noncharged cases as aggravating factors in determining the severity of the charged violations and the proper sanction. Respondent was clearly aware of this.

There is an important distinction in how the evidence of respondent's conduct in the other proceedings was used. In *In re Kilburn*, we held that a single instance of delay in rendering a decision is not a violation of Canon 3A(5) ("judge should dispose promptly of the business of the court") unless "there is a pattern of unreasonable delay or where a particular instance is so lacking in legitimate justification that it is willful." 157 Vt. 456, 459, 599 A.2d 1377, 1379 (1991). There is nothing in Canon 3A(3) to suggest that only a pattern of misconduct, or a willful incident, violates the Canon. More important, respondent has not challenged that he can be sanctioned for specific incidents of violation of Canon 3A(3), whether or not willful. Thus, there is only limited significance to whether respondent is charged with specific incidents of violation of Canon 3A(3) or a pattern of violation.

The fact that respondent was not charged with a pattern of violation does not mean that the Board could not consider other instances of respondent's in-court conduct in making a recommendation on sanction. See *In re Ackel*, 745 P.2d 92, 96 (Ariz. 1987). We have dealt with this due process issue in criminal sentencing, and although this is not a criminal proceeding, believe the due process considerations are similar. In *State v. Ramsay*, 146 Vt. 70, 81–82, 499 A.2d 15, 22 (1985), we held that "reliable factual information, with full disclosure sufficiently in advance of sentencing to allow an adequate opportunity for rebuttal [including] [e]vidence of other criminal acts by defendant" can be admitted and relied on at sentencing. We amplified this reasoning in *State v. Doucette*, 150 Vt. 125, 127, 549 A.2d 268, 269 (1988), where we held that evidence of unrelated criminal activity could be considered so that the sentence would fit the offender.

Although, as discussed in more detail *infra*, the purpose of a judicial disciplinary proceeding is remedial, the need for

information beyond the specifics of the incidents for which respondent is charged is similar to such need in proceedings involving punitive action. The sanction must be tailored to the individual and the administration of justice. In determining an appropriate sanction, the Board can consider conduct for which respondent is charged if respondent has notice of the evidence involved and an opportunity to rebut.

In this case, respondent knew of the evidence from the other proceedings and stipulated to its admission. The stipulation did not require respondent to waive his right to present evidence regarding the other cases. In fact, he presented prefiled testimony responding to each of these cases. Paragraph 8 confirmed that he would be given the opportunity to "present such further evidence . . . on his behalf and any further descriptions of the events in the record that he wishes to provide." He appeared before the Board and presented evidence on two different occasions; he was not foreclosed the opportunity to present any defense that he wished. We find no violation of due process.

Respondent also claims that the Board violated the stipulation by rejecting his expressions of remorse for his misconduct. Paragraph 6 provides that he has "recognized the inappropriateness of his conduct" in *Greene* and that the Board "is assured that such conduct will not recur." In paragraph 7, the stipulation recites that he "appreciates how Mrs. Georges could have misunderstood his intentions," and that he admits that "he could do it better."

Respondent availed himself of the opportunity to address the Board personally, under oath, on this subject, and the Board found his testimony "disappointing." In his testimony, he made repeated statements that he was sorry that *other people* misunderstood or misperceived him; the Board viewed these statements as reflecting inadequate self-recognition by respondent of the objectionable nature of his conduct. His own testimony at the January 9, 1992 hearing shows that he was never remorseful in regard to the *Georges* matter:

> I feel that everything I did in the *Georges* case was right. I admit no wrongs. I admit no violations of the Canons. If I had it to do over, I would probably do it pretty much the same.

We agree with the Board's statement that "[d]ue process was not violated when the Board listened" to respondent's testimony, and considered that testimony during its deliberations.

Respondent's fourth charge is that a member of the Board, Jean Brockway, included in the confirmation of the final order and recommendation a "gratuitous" statement that she had advocated a more stringent sanction than the one finally adopted for recommendation. He claims that this statement is a violation of the stipulation. As noted above, the stipulation bound counsel to the Board with respect to sanction, but not the Board. In any event, the Board recommended the stipulated sanction, and Jean Brockway signed that recommendation. The fact that she might have initially advocated a more severe sanction is hardly cause for a new hearing.

In this claim, respondent also attacks the Board for "suggesting" to this Court that grounds exist to charge him as a pattern offender, and for including "reckless accusations" that a basis exists for his suspension or removal. This is largely a redressing of the arguments relating to the pattern of misconduct issue discussed above. In any event, we point out again that the only final decision in this judicial conduct action is ours, and the Board's suggestions are not alone grounds for a new hearing.

Respondent's fifth claim is that he was prejudiced when the Board allowed its prosecutor to actively participate in the deliberative process. In this manner, he argues, he was deprived of an impartial "court," citing language from our opinion in *In re Crushed Rock, Inc.*, 150 Vt. 613, 621–22, 557 A.2d 84, 89 (1988), to support his assertion that a merging of the investigative and adjudicative functions of a disciplinary board violates due process. We held in *Crushed Rock*, however, that dual involvement by the Environmental Board in prosecuting and adjudicating an Act 250 permit revocation did not violate due process. *Id.* at 622, 557 A.2d at 89. Further, the established legal doctrine governing this issue is that "the combination of investigative and adjudicative functions does not, without more, constitute a due process violation." *Withrow v. Larkin*, 421 U.S. 35, 58 (1975). There is less likely to be a due process concern where, as here, the body in question is not the final decision-making authority in the case. Although it may be desirable, an agency or board which has the power only to recommend penalties is

not required to establish an independent investigatory and adjudicatory staff, and challenges based on the alleged partiality of such tribunals have been rejected by every jurisdiction which has considered the issue. See *Kloepfer v. Commission on Judicial Performance*, 782 P.2d 239, 242–43, 264 Cal. Rptr. 100, 103–04 (1989); see also *In re Mikesell*, 243 N.W.2d 86, 91–92 (Mich. 1976) (collecting cases); *In re Brown*, 512 S.W.2d 317, 321 (Tex. 1974) (same).

Respondent next claims that his due process rights were violated when the Board found, "in essence," an uncharged violation of Canon 5 of the Code of Judicial Conduct. Referring to paragraph 42 of the final recommendation, he states that "[b]y subtle draftsmanship, the Board has attempted to advise the Supreme Court that [he] violated Canon 5(E)," which directs that judges not participate in alternative dispute resolution as official arbitrators or mediators. This contention merits little discussion. The Board did not charge, find or conclude that respondent acted as a mediator or in any way violated Canon 5. Paragraph 42 merely recites the Board's conclusion that respondent's preference for mediation as a mechanism for dispute resolution was contributing to his difficulties in conducting himself in accordance with Canon 3A(3). No procedural error was committed by its inclusion in the Board's final report.

The last procedural error alleged by respondent is that the Board was inherently and impermissibly reviewing judicial decision-making by considering the fact that, in *Georges*, he denied a litigant her hearing rights. He contends that the subjective "feelings" of the litigant are an insufficient basis for imposing discipline, and that clear and convincing evidence is required. We read the Board's findings on this point as going to show a lack of the attributes of conduct required by Canon 3A(3), such as patience and courtesy, not incorrect judicial decision-making.

The Board states that it found that respondent's actions in *Georges* clearly demonstrated a lack of dignity, courtesy, and patience, particularly his actions *after* denying the litigant her hearing. The record provides adequate support for this conclusion; the transcript shows that respondent threatened the litigant's daughter with a transfer of custody, which was not at issue in the case, and rebuked the litigant mother when she

attempted to comfort her distraught daughter. The Board summarized the actions of respondent in *Georges* that it found objectionable in its final report; we find that the evidence supporting the findings is clear and convincing, and that the Board has not second-guessed respondent's judicial actions in an inappropriate way. Further, we agree with the Board that the subjective reaction of a complainant is pertinent, in view of the goal of maintaining public confidence in and respect for the judiciary, and that subjective good intentions on the part of a judicial officer are not necessarily sufficient.

Finally, respondent asserts that a remand or dismissal is required in this case because the violations of due process shaped the nature and extent of the evidence so that independent review of the evidence by this Court is impossible. We have found no due process violations either in the specific actions of the Board complained of or in the aggregate. None of the asserted errors prejudiced respondent, who had full opportunity to present his evidence and his case. As none of the procedural anomalies complained of affected the outcome of the Board's hearings, we see no reason to accord the Board's recommendation less weight, or to remand or dismiss this case. See *In re Hill*, 152 Vt. at 559, 568 A.2d at 367.

### III.

We have reviewed the evidence consisting of the stipulation of facts, the exhibits, the testimony at the two hearings and the transcripts of proceedings in which respondent presided. We accord the findings and conclusions of the Board great weight, *id.* at 556, 568 A.2d at 365, and adopt them as our own. We particularly note, as did the Board, that each transcript involved temperamental behavior in family proceedings. Based on our findings, we conclude that respondent has violated Canon 3A(3) of the Code of Judicial Conduct in both the *Greene* and *Georges* cases.

### IV.

Our decision on sanctions is guided first by general principles that govern the judicial disciplinary process and the conduct of judges. The purpose of judicial discipline is not to punish, although we do seek to deter respondent and others

from future misconduct. See *In re Eads*, 362 N.W.2d 541, 551 (Iowa 1985); *In re Yaccarino*, 502 A.2d 3, 30 (N.J. 1985). The primary purpose is to protect the public, ensure the even-handed administration of justice, and preserve and enhance public confidence in the integrity and fairness of the justice system. See *Kloepfer v. Commission on Judicial Performance*, 782 P.2d at 262, 264 Cal. Rptr. at 123; *In re Gorby*, 339 S.E.2d 702, 703 (W. Va. 1985). Judicial misconduct denigrates the institution and affects attitudes well beyond the individual cases involved. See *In re Probert*, 308 N.W.2d 773, 776 (Mich. 1981).

Second, the standards of appropriate conduct for a judge are very high. We emphasized in *In re Douglas*, 135 Vt. 585, 592, 382 A.2d 215, 219 (1977), the "stringency of the standards of conduct to which members of the judiciary are and must be held" and explained that the Canons "embrace tests of behavior relating to integrity and propriety that condemn actions in which the average citizen can freely indulge without consequence."

Third, the standard of conduct set by Canon 3A(3) is central to effective administration and the integrity of the judicial process. The Maine Supreme Judicial Court captured the essence of the canon in *In re Kellam*, 503 A.2d 1308, 1312 (Me. 1986):

> Although discourtesy does not constitute an error or violation of law in the decision-making process, such conduct on the part of a judge is particularly egregious because it undermines respect for the law in a most insidious manner. Our appellate process effectively corrects judicial error and the mere occurrence of such error does not usually inflict lasting damage upon our system of laws. On the other hand, a litigant who is subjected to rude and insensitive treatment is left without recourse. Whether the litigant wins or loses, the end result is an irreparable loss of respect for the system that tolerates such behavior. We conclude that a pattern of judicial discourtesy represents a profound threat to the institution of the law and requires a strong response.

This is an application of long-accepted truths. In his essay "Of Judicature," Francis Bacon stated that "[p]atience and gravity of hearing is an essential part of justice, and an over-speaking judge is no well-tuned cymbal."

We would add that judicial intemperance invariably conveys the message of a closed mind. It is never appropriate for a judge to become a "combatant with a party." *In re Eastmoore*, 504 So. 2d 756, 758 (Fla. 1987). Participants will never accept that a decision rendered by a combatant is fair.

In making these comments, we recognize that judges have different styles and personalities, and that these qualities alone are not the issue. Patience, dignity and common courtesy are essential parts of judging, whatever the personality of the judge.

We also recognize that Vermonters pride themselves on civility and personal interaction, even when solving the most difficult of problems. We cannot let the judiciary become an impersonal and authoritarian institution, relying for legitimacy solely on its power. We can never tolerate the intemperate use of power; we must go out of our way to understand, explain and persuade.

Fourth, all of these considerations are more significant when members of the judiciary deal directly with litigants. Cf. *In re Hill*, 152 Vt. at 573–74, 568 A.2d at 374–75 ("tough questioning" of lawyers during oral argument in Supreme Court not a violation of Canon 3A(3)). They are more significant still in the adjudication of family matters. The need for institutional acceptance and respect is highest in family matters, where the damage that can be inflicted by judicial rudeness and intemperance is the greatest. At the same time, we must acknowledge that the stresses on the judge are also heightened in family court. It takes superhuman patience to sit through a long day of personal conflict, exacerbated by raw emotion and attitudes that put greater effort on inflicting personal pain than on resolving disputes. The essence of judicial temperament, however, is the ability to diffuse emotional responses and facilitate reasonable ends, voluntarily accepted, especially where children are involved. Judicial intemperance will only undermine the effectiveness of the decisions that the court renders.

The Legislature created the family court to place the proper focus on family proceedings. In two short years, it has grown to an essential component of the administration of justice in Vermont and has greatly improved the speed and effectiveness of family dispute resolution. It has also facilitated voluntary set-

tlement of family disputes through mediation, a policy particularly endorsed and aided by respondent. All its strengths will be valueless, however, if the public comes to view it as a place that inflicts further pain on litigants as it tries to resolve the cases that come before it. Family court judges must deliver no less than the superhuman patience and understanding that the proceedings require.

In view of these considerations, and the conduct in which respondent has engaged, we accept the recommendation of the Board that respondent be publicly reprimanded. Because our purpose is to enhance public confidence in the integrity and fairness of the justice system, we believe we must go further. Our powers in fashioning an appropriate sanction are broad. See Vermont Const. ch. II, §§ 30, 36; 4 V.S.A. § 3; *In re Hill*, 152 Vt. 576, 577, 569 A.2d 446, 446 (1989) (mem.). As part of our administrative powers, we may control assignments of trial judges. See Vermont Const. ch. II, §§ 30, 37; 4 V.S.A. §§ 3, 21a, 73; Administrative Order No. 13, § 5.

Other courts have restricted judicial assignments in connection with judicial disciplinary proceedings in order to ensure public confidence in specific parts of the judicial system. Recently, for example, the Florida Supreme Court removed a circuit court chief judge from the position of chief judge because of the "sensitivity and discretion" required of those who hold the office and the impact on his effectiveness caused by his endorsement of discriminatory racial stereotypes. *In re Removal of a Chief Judge*, 592 So. 2d 671, 672 (Fla. 1992). That same court had restricted a judge who had engaged in serious conduct unbecoming to a member of the judiciary from sitting on criminal cases. *In re Lee*, 336 So. 2d 1175, 1177 (Fla. 1976). In another recent case, the Massachusetts Supreme Judicial Court prohibited a district judge from sitting in the county where his misconduct had occurred. *In re King*, 568 N.E.2d 588, 599 (Mass. 1991).

Like the Board, we are particularly concerned that respondent has not acknowledged the inappropriateness of his behavior in the *Georges* case. In both the *Greene* and *Georges* cases, there is a wide gulf between how we and the Board view respondent's conduct and his own self-examination of that conduct. With one exception, the reference to litigants as

"animals," respondent believes he has done nothing wrong. Thus, there is a great risk that if respondent continues to sit in family court his intemperate behavior will persist, adversely affecting vulnerable litigants in that court. In order to ensure fair and effective dispute resolution in the family court, and to maintain public confidence in that court, we direct that respondent not sit in family court for a period of two years from the date of this order. During this period, the trial court administrative judge shall develop a program of training and counseling for respondent so that his inappropriate conduct in family matters will not recur, should respondent be assigned to the family court after the two-year period. Our consent to such an assignment will depend upon the effectiveness of these measures as conveyed to us by the trial court administrative judge.

*Superior Judge Arthur J. O'Dea is hereby publicly reprimanded for violations of Code of Judicial Conduct Canon 3A(3) as found by this Court. He is prohibited from sitting in the family court for a period of two years from the date of this order.*