889 P.2d 175

**In the Matter of Joe Cruz
CASTELLANO, Jr.,
District Judge.**

**No. 22126.**

Supreme Court of New Mexico.

Jan. 26, 1995.

Peg Holguin, Director, Fred R. Harris, Chairman Judicial Standards Com'n, Albuquerque and George Gary Duncan, Sp. Counsel, Santa Fe, for petitioner.

Marchiondo & Vigil, P.A., William C. Marchiondo, Michael E. Vigil; the Norvell Law Firm, David L. Norvell; and Messersmith, McNeill & Barr, Lanny D. Messersmith, Albuquerque, for respondent.

### OPINION

PER CURIAM.

Pursuant to its power under New Mexico Constitution Article VI, Section 32, the Judicial Standards Commission of the State of New Mexico petitions this Court for an order permanently removing from office the Honorable Joe Cruz Castellano, Jr., District Judge, Division II, First Judicial District, on the grounds of willful misconduct in office. Judge Castellano contends that his rights to due process have been violated; that, as a result of recent amendments in the state constitution, this Court lacks authority to order his removal from office; that the standard of proof for disciplining a judge should be that the fact-finder is satisfied that the charges are true by proof beyond a reasonable doubt; and that even if this Court adheres to the view that the standard of proof is clear and convincing evidence, the charges against him were not proved by clear and convincing evidence. In answering these contentions, this Court has considered the questions whether the Commission's findings and conclusions support a determination that Judge Castellano has engaged in willful misconduct within the meaning of Article VI, Section 32 and, if so, whether that conduct merits the sanction of removal. For the following reasons, we grant the Commission's petition.

### BACKGROUND

The Commission's petition supplements a prior request for relief. The Commission originally petitioned this Court in May 1994 for an order permanently removing Judge Castellano from office on the basis of a complaint filed in January 1994 by Martha A. Frank, Court Administrator for the First Judicial District, and a complaint filed in March 1994 by the Honorable Petra Jimenez Maes, Chief Judge of the District.

The original petition invoked this Court's power of superintending control under New Mexico Constitution Article VI, Section 3, and the Commission's authority under Article VI, Section 32 and requested an expedited briefing schedule and hearing date. The Commission had consolidated the two complaints, Nos. 94-03 and 94-25, for hearing and scheduled the matter for trial in April 1994 before three district judges acting as Special Masters: the Honorable Frank H. Allen and the Honorable Gerald R. Cole, district judges for the Second Judicial District, and the Honorable Robert M. Doughty II, district judge for the Twelfth Judicial District. Both Judge Cole and Judge Doughty are also members of the Judicial Standards Commission; Judge Allen is not.

On May 6, 1994, the Special Masters issued a report, which included findings of fact

and conclusions of law, recommending that the Commission seek the immediate permanent removal of Judge Castellano from office and, in the alternative, immediate temporary removal pending the completion of other pending matters. On the same day the Commission accepted and adopted the report and directed its special counsel, George Gary Duncan, to petition this Court for the recommended relief. On June 20, 1994, this Court heard oral argument on the original petition and on June 22 issued an order immediately suspending Judge Castellano from office, remanding the matter back to the Commission for further consideration, and ordering that the Commission send a final recommendation in no more than six months.

In August 1994 the Commission began formal proceedings against Judge Castellano in a consolidated case that encompassed the charges made in Nos. 94–03 and 94–25 and two other matters: No. 93–52, concerning Judge Castellano's relationship with an organization known as First CASA (Court–Appointed Special Advocates, volunteers for children in dependency proceedings), which regularly engaged in proceedings before him; and No. 94–67, concerning Judge Castellano's conduct in presiding over the matter of *City of Espanola v. Schneider*, Rio Arriba County Cause No. 88–1282(c). In October 1994 Special Masters Allen, Cole, and Doughty heard evidence and then issued a second report, which included findings and conclusions, that again recommended permanent removal of Judge Castellano for willful misconduct in office. Judge Castellano filed objections to the report, and the Commission heard oral argument in November 1994. Following oral argument, the Commission overruled Judge Castellano's objections and adopted the report.

Subsequently the Commission's special counsel filed a supplemental petition for removal with this Court, requesting a briefing schedule and hearing date, renewing its prior request for an order permanently removing Judge Castellano from his judicial office, and assessing costs and expenses against him. This Court heard oral argument on January 11, 1995, and reserved ruling.

We begin with Judge Castellano's argument that this Court lacks constitutional authority to order his removal from office because that argument touches our jurisdiction as well as that of the Commission. We next address his argument that he has been deprived of due process and that the appropriate remedy would be dismissal of the charges. Finally, we consider his remaining arguments, which challenge the sufficiency of the evidence and the findings and conclusions on which the Commission has relied in its supplemental petition for removal.

*THE SUPREME COURT'S POWER TO REMOVE A DISTRICT JUDGE FROM OFFICE FOR WILLFUL MISCONDUCT*

Judge Castellano notes that in 1988 the people of New Mexico in adopting a form of merit selection for appellate, district, and metropolitan court judges, *see* N.M. Const. art. VI, §§ 33–37, described the various ways in which a judicial office becomes vacant, *see* N.M. Const. art. VI, § 34. That description, he contends, contains an exclusive listing, and because the listing does not mention removal by the Supreme Court, the 1988 amendments have superseded the constitutional authority on which the Commission has relied in petitioning this Court for his removal. We disagree.

The language on which Judge Castellano relies is as follows:

The office of any justice or judge subject to the provisions of Section 33 of Article 6 of this constitution becomes vacant on January 1 immediately following the general election at which the justice or judge is rejected by a majority of those voting on the question of his retention or rejection or on January 1 immediately following the date he fails to file a declaration of candidacy for the retention of his office in the general election at which the justice or judge would be subject to retention or rejection by the electorate. Otherwise, the office becomes vacant upon the date of death, resignation or removal by impeachment of the justice or judge. The date for filing a declaration of candidacy for retention of office shall be the same as that for filing a declaration of candidacy in a primary election.

N.M. Const. art. VI, § 34. Specifically, he contends that the second sentence precludes this Court from removing him from office because his right to occupy that office continues until his death, resignation, or removal by impeachment pursuant to New Mexico Constitution Article IV, Section 35. Article IV, Section 35 provides that the "sole power of impeachment shall be vested in the house of representatives."

Judge Castellano's argument asks this Court to read Article VI, Section 34 without regard to the context in which it appears and thus without regard to either the legislative purpose in proposing merit selection or the popular will in approving the amendment. Article VI, Section 34 contains the listing of when a judicial vacancy occurs in order to establish the point at which the appropriate nominating commission must begin its process for recommending names to the governor for appointment to fill that vacancy. Article VI, Section 35 requires the relevant nominating commission to meet within thirty days "[u]pon the occurrence of an actual vacancy," and Article VI, Sections 36 and 37 incorporate that provision by reference. Article VI, Section 34 defines the date of vacancy for a judge or justice who fails to be retained as January 1 of the year following the general election in which the judge or justice was unsuccessful in his or her attempt to be retained—an event for which no provision had been made prior to 1988. This same section then indicates that in other cases, the vacancy occurs when the judge ceases to serve as a result of death, resignation, or removal by impeachment.

We recognize, as Judge Castellano has noted, that the listing does not refer to the possibility of removal by the Supreme Court. We think that fact should be taken into account in construing Article VI, Section 34, but we also think that failure to specify removal by the Supreme Court as an occurrence of vacancy is inconclusive because other portions of the Constitution fill any gap and otherwise make the legislative intent clear.

■ Article VI, Section 35 provides that the relevant commission shall meet within a period of time after an actual vacancy. In the case of removal by the Supreme Court, as in the case of impeachment by the New Mexico House of Representatives, the commission chair should be able to determine on his or her own or with the assistance of the Attorney General when the vacancy actually occurs. Further, Article VI, Section 32 describes the procedures of the Judicial Standards Commission as "alternative to, and cumulative with, the removal of justices, judges and magistrates by impeachment and the original superintending control of the supreme court." In view of the particular purpose for which Article VI, Section 34 was enacted, we construe Article VI, Section 34 as referring to removal by impeachment or by those methods that under our constitutional scheme are analogous. Because Article VI, Section 32 expressly characterizes this Court's powers of removal, on petition by the Judicial Standards Commission or under its superintending control, as alternative and cumulative with the legislature's power of removal by impeachment, we believe that Article VI, Section 34 does not limit this Court's authority to act upon the Commission's petition.

## DUE PROCESS CONCERNS

Judge Castellano raises several aspects of the Commission's procedures in contending that he was denied due process of law. Some of them occurred prior to this Court's remand in June 1994. For example, he notes that in April he was given less than thirty days to show cause before the Special Masters why he should not be removed from office; further, he notes that the Commission adopted the first report of the Special Masters on the same day that they issued it. Our order remanding the matter to the Commission took into account these objections to the original petition, and Judge Castellano does not contend that the procedures surrounding the second hearing before the Special Masters suffered from all the same defects. Rather, he contends, as he argued before the Commission, that under the Commission's own rules, Judges Cole and Doughty should have been disqualified. He also contends that the Commission failed to discharge its constitutional responsibilities be-

cause it referred the critical functions of hearing the evidence, making findings of fact, and reaching conclusions of law to the Special Masters, and then largely or completely deferred to their work.

Judge Castellano argues that Judges Cole and Doughty should have been disqualified or should have disqualified themselves as Special Masters because Mr. Duncan, on behalf of the Commission, participated in what might be viewed as plea negotiations prior to the final formulation of the charges made in August 1994 after remand. *See State ex rel. Anaya v. Scarborough,* 75 N.M. 702, 709, 410 P.2d 732, 736 (1966) (person should not be required to face trial before judge who has in any manner participated in efforts to persuade him to plead guilty); *see also* Commission Rule 5(b) ("A commissioner shall not participate in any matter if a judge similarly situated would be disqualified in a court proceeding."). He also argues that Judges Cole and Doughty should have been disqualified or should have disqualified themselves because they had presided in an inferior tribunal when they acted as Special Masters. *See id.; see also* SCRA 1986, 21–400(C) (Repl. Pamp.1994) ("A judge is disqualified and shall recuse himself in any proceeding in which ... [h]e acted in his official capacity in any inferior court....").

■ Proceedings before a judicial review board must be conducted to provide the respondent with procedural due process. *In re O'Dea,* 159 Vt. 590, 622 A.2d 507, 511 (1993). The presence of procedural errors by the administrative body, in this case the Commission, will not affect a reviewing court's consideration of a judicial misconduct case unless the errors actually prejudiced the respondent. *Id.* Neither of Judge Castellano's arguments provides a basis for dismissing the charges because of due process violations. There is no evidence in the record that connects either Judge Cole or Judge Doughty to the pre-filing activities of Mr. Duncan. Further, the Commission decided to file charges weeks after these activities occurred. Thus, there is no basis in the record for finding that either Judge Cole or Judge Doughty had participated in an attempt to persuade Judge Castellano to plead

guilty, conduct that could be viewed as having predetermined the facts. We also are not persuaded that the hearings before the Special Masters should be viewed as proceedings before an inferior tribunal within the principles on which Judge Castellano bases his argument. Rather, those hearings would appear to be more accurately viewed as a convenient, preliminary division of labor within a large group charged with a number of tasks, some of which were more suited to a smaller group. Such a procedure does not rise to the level of a due process violation. *Cf. In re Graham,* 620 So.2d 1273 (Fla.1993) (rejecting judge's claim that administrative body's dual performance as factfinder and judge violated due process), *cert. denied,* —— U.S. ——, 114 S.Ct. 1186, 127 L.Ed.2d 537 (1994); *O'Dea,* 622 A.2d at 514 (due process violation less likely when administrative body is not final decision making authority).

■ Judge Castellano also argues that the Commission in effect delegated its constitutional responsibilities to the Special Masters. Article VI, Section 32, however, specifically authorizes the appointment of "three masters who are justices or judges of courts of record to hear and take evidence in the matter and to report their findings to the commission" and also provides that "if the commission finds good cause, it shall recommend to the supreme court the discipline, removal or retirement of the justice, judge or magistrate." We agree that there is a potential in the procedures that the Commission followed for those commissioners who are also judges to have disproportionate influence. In evaluating the complaints that come before the Commission, commissioners who are also judges may be perceived to have influence disproportionate to their numbers, regardless of whether the Commission employs a panel of special masters. Choosing special masters who are not Commissioners might be a wise precaution against an erroneous perception of even greater influence. Nevertheless, the procedures the Commission followed track the language of the constitutional amendment that created the Commission. Thus, we decline to add a provision that restricts the Commission's flexibility in adopting procedures unless it is constitutionally required.

We conclude that the due process arguments advanced do not support dismissal.

### REMOVAL AS AN APPROPRIATE SANCTION

Judge Castellano argues that principles of equal protection require that the Commission be required to find he engaged in willful misconduct in office by proof beyond a reasonable doubt. He acknowledges that we held in *In re Martinez,* 99 N.M. 198, 203, 656 P.2d 861, 866 (1982), that the standard was proof by clear and convincing evidence, but he asks that we overrule *Martinez* on the ground there is no basis for treating a judge differently than a county official to whom NMSA 1978, Sections 10–4–1 to –29 (Repl. Pamp.1992), apply. Under those statutes, charges underlying a removal proceeding must be presented to a grand jury, *see* § 10–4–3, and proof must be beyond a reasonable doubt, *see State ex rel. Mitchell v. Medler,* 17 N.M. 644, 651, 131 P. 976, 979 (1913).

 The constitutional guarantee of equal protection does not require the legislature in making statutory distinctions nor the citizens in approving constitutional amendments to treat situations that are different as if they were similar. Rather, the constitutional guarantee demands that like situations be treated alike. A judge, unlike other county officials, has the extraordinary powers of holding persons in contempt, of sentencing, and of making rulings that affect property as well as liberty interests until and unless overturned on appeal. Given the power with which a judge is entrusted, we have no doubt that, as a matter of equal protection principles, he or she may be distinguished from other county officials and be subjected to removal from office on less than proof beyond a reasonable doubt. We decline to overrule *Martinez.* We note that the standard of clear and convincing evidence represents the standards applied in most states. *See In re Nowell,* 293 N.C. 235, 237 S.E.2d 246, 254 (1977). We turn now to the findings and conclusions of the Commission.

### NOS. 94–03 AND 94–25

The Special Masters found that beginning in January 1990 and continuing into 1994, Judge Castellano harassed and interfered with Martha Frank in her capacity as Court Administrator. In January and February 1990 he directed her to transfer certain sequestered matters contrary to a standing administrative order, and when she complained to the then Chief Judge, Judge Castellano raised with the Chief Judge concerns about her competence, asked that his memorandum be made part of her personnel file, and began to pursue his own investigation. Eventually, Frank filed a complaint with the New Mexico Judicial Standards Commission, Closed File No. 78–37, and the Chief Judge personally conducted the investigation of Judge Castellano's charges. At the conclusion of that investigation, the Chief Judge announced that none of the charges had been substantiated and that Frank had acted as was necessary and appropriate.

In the fall 1991, the other judges in the First Judicial District began to express concerns about Judge Castellano's ties to a program known as First CASA, which provided volunteers to assist children involved in abuse and neglect cases. At that time, abuse and neglect cases were assigned to Judge Castellano. In December Chief Judge Maes issued a memorandum to Frank ordering her as Court Administrator to reassign abuse and neglect cases to another judge. On the same date, Judge Castellano ordered Frank to ignore Chief Judge Maes' order; Chief Judge Maes then advised Judge Castellano by memorandum that he had no authority to countermand her order. A copy of this memorandum went to Frank. On December 10 Judge Castellano sent another memorandum to Frank ordering her not to reassign cases. On December 13 Frank transferred 78 abuse and neglect cases from Judge Castellano to Judge Encinias and directed that new cases would be assigned to Judge Encinias as well. On December 15 Judge Castellano issued an "Order to Show Cause" directed to Frank and served by the deputy sheriff assigned as security at the courthouse. As ordered, the deputy sheriff conducted Frank to Judge Castellano's courtroom, where the Judge asked her whether she had any reason why he should not hold her in contempt. When she declined to answer until her attor-

ney arrived, he ordered the deputy sheriff to arrest Frank and place her in the courthouse holding cell. Because the cell was occupied by a penitentiary inmate, the deputy sheriff put Frank in a vacant office near the holding cell. Subsequently Chief Judge Maes entered an order releasing Frank from custody. Acting on Frank's behalf, the Attorney General then filed a petition for a writ of prohibition with this Court. On December 22, 1993, this Court heard oral argument and then issued the writ, which prohibited Judge Castellano from countermanding the orders of the Chief Judge.

The Special Masters concluded that these acts were committed intentionally, maliciously, willfully, with reckless and deliberate indifference, and in violation of Frank's Fourth Amendment rights to be secure from unlawful seizure, and her rights to due process under the Fourteenth Amendment to the federal Constitution and Article II, Section 18 of the State Constitution. The Special Masters also found that on other occasions Judge Castellano subsequently refused to obey legitimate directions of Chief Judge Maes.

In November 1993 Chief Judge Maes sent a memorandum to each of the judges in the First Judicial District asking them to provide copies of their daily docket sheets to the deputy sheriff assigned as a security guard for the court. In January 1994 Judge Castellano began to refuse to comply. On January 11 after the deputy sheriff had repeatedly asked Judge Castellano's secretary for a copy of his daily docket sheet, Judge Castellano came to the top of the stairs in the commons area of the courtroom and began yelling at the deputy as he descended the stairs. Using profanity and raising his voice, Judge Castellano asserted that he was not going to provide the sheets because what went on in his courtroom was nobody's business. He repeated his defiance the next day in his own chambers to the deputy. On February 11 Chief Judge Maes again ordered Judge Castellano to comply and to give her his calendar book for December 1 through February 14. Judge Castellano complied only by providing a copy of his docket sheet for February 14. On February

16 Chief Judge Maes again ordered Judge Castellano to comply with her orders regarding the daily docket sheets and calendar book. He continued to refuse to comply until April 1994. The Special Masters found that Judge Castellano's verbal abuse of the deputy sheriff and use of profanity was discourteous, undignified, and disrespectful and that his defiance of Chief Judge Maes' orders was in contempt of this Court.

Further, in December 1993 Judge Castellano had agreed to hear some domestic violence cases in order to relieve the load the hearing officer was then experiencing. This agreement was reached in consultation with Judge Serna, the Family Court presiding judge, who had obtained approval from Chief Judge Maes. In late January, however, after the hearing officer and Judge Serna had attempted unsuccessfully to organize a schedule for the planned assistance, Judge Castellano refused to hear any domestic violence cases except under special circumstances. Eventually the Chief Judge intervened and ordered Judge Castellano to comply with the schedule Judge Serna and the hearing officer had proposed. He refused, she reiterated her order, and he complied by sitting on two different occasions but failed to hear all issues, referring most back to the hearing officer to determine the child support issues. When Chief Judge Maes ordered Judge Castellano to hear all the issues, he summoned the hearing officer, ordered her to hear the child support issues, and advised Chief Judge Maes he would not hear or determine those issues himself. On March 14 Chief Judge Maes again ordered Judge Castellano to hear the domestic violence cases as agreed and to desist from issuing contrary orders to court staff. Chief Judge Maes filed a complaint with the Commission as well as a letter to this Court, and Judge Castellano then began to comply with the orders regarding the domestic violence cases.

The Special Masters concluded that in Judge Castellano's conversation with the hearing officer he had treated her discourteously and disrespectfully and acted without dignity. They found his conduct was violative of SCRA 1986, 21–100 (Repl.Pamp.1994)

("A judge shall observe high standards of conduct so that the integrity and independence of the judiciary may be preserved."), and of SCRA 1986, 21–200(A) (Repl. Pamp.1994) ("A judge shall respect and comply with the law and shall conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.").

In addition, the Special Masters found that Judge Castellano worked very little over the seven-month period from September 1993 through March 31, 1994. The Special Masters concluded that Judge Castellano deliberately failed to devote to the court the number of hours required of a district judge. Finally, they concluded that he had been in contempt of this Court in refusing to comply with and in attempting to countermand the Chief Judge's lawful administrative orders.

The Special Masters also found that in March 1994 Judge Castellano made inquiries about an adoption proceeding filed in the First Judicial District that involved a relative of Chief Judge Maes, and in so doing he disclosed information from a file that by law is confidential. *See* NMSA 1978, § 32A–5–8, –40(A)(1) (Repl.Pamp.1993). Specifically, Judge Castellano questioned district court clerks about the adoption file and contacted a staff attorney for the Children, Youth and Families Department regarding the proceeding. The Special Masters determined that the adoption was handled properly and that Judge Castellano had made reckless allegations to the contrary, comparable to the unsubstantiated charges made against Frank in 1990. The Special Masters refused to find, however, that Judge Castellano was responsible for providing the *Albuquerque Journal* with a copy of the adoption file.

After remand from this Court, the Special Masters heard some additional testimony, but made no specific changes in their findings and conclusions regarding these cases. After the remand from this Court in June 1994, the Special Masters considered two other cases, No. 93–52 and No. 94–67. The former concerned Judge Castellano's dealings with First CASA; the latter concerned his conduct in *City of Espanola v. Schneider*. We address each separately.

*NO. 93–52*

The Special Masters found that First CASA of Santa Fe was a not-for-profit organization whose purpose was to recruit, train, and oversee volunteers who served as Court–Appointed Special Advocates for abused and neglected children in juvenile dependency proceedings; it was regularly engaged in proceedings that came before the Children's Court judge of the First Judicial District. Judge Castellano was the Children's Court judge for the First Judicial District from April 1989 until December 1993.

The Special Masters found that Judge Castellano had de facto control over First CASA, that he personally selected a majority of the board of directors, and that he personally caused the hiring and firing of directors. His wife served as Executive Director, for a salary, on two separate occasions and acted as First CASA's primary fundraiser. She solicited contributions from lawyers who regularly appeared before the judge. She used his chambers and telephone to solicit funds. Judge Castellano allowed the use of his name, title, and photograph in a brochure used to solicit funds, and the use of stationery with his official telephone number, all after resolution of Inquiry No. 92–37 before the Commission, involving a solicitation letter sent out by Mrs. Castellano in 1992. The Special Masters specifically found that the 1993 fundraising package for First CASA "was the functional equivalent" of the 1992 fundraising letter the Commission had previously found to be in violation of SCRA 1986, 21–500(C)(2) (Cum.Supp.1991). In 1993 one law firm made a contribution in the amount of $1,000 to First CASA the same day that Judge Castellano ruled in favor of a client of that firm. The same year another law firm made a contribution in the same amount at the same time that Judge Castellano was presiding over a criminal trial involving a relative of a member of that firm. The Special Masters also found that Judge Castellano used First CASA funds to attend a national convention, but did not attend most of the convention, and left the convention before its conclusion to visit a relative of his wife. Finally, members of First CASA's Board of

Directors under Judge Castellano's control impeded the Commission's investigation of Cause No. 93–52. The Special Masters determined that the Commission failed to carry its burden of proof regarding charges of ex parte communications with CASA volunteers in pending cases, personal solicitation of funds by Judge Castellano, a $1,000 contribution from a party to litigation within one month after a bench trial involving that party, and a contribution solicited by Mrs. Castellano, that was not deposited into CASA's bank account.

When Judge Castellano was removed as Children's Court judge in December 1993, First CASA ceased to exist, a fact from which the Special Masters inferred that Judge Castellano used CASA as a vehicle to advance his political career. The Special Masters ultimately concluded that Judge Castellano had used the prestige of his office to solicit funds, contrary to SCRA 21–500(C)(1), and that he had failed to observe the high standards of conduct required by SCRA 21–100 and –200. They concluded he had "created the appearance of impropriety in that he conveyed the appearance or impression or allowed others to create the appearance or impression that persons would be in a special position to influence the decisions of the Judge by making contributions to First Casa." The Special Masters also found that closed file No. 92–37, the previous disciplinary proceeding, established Judge Castellano was aware of the limitations placed upon him and that the violations identified in No. 93–52 were intentional. They also found that Judge Castellano "used First Casa as an organization and the funds it raised to place himself and his work in abuse and neglect cases at the center of attention to further his own interests."

### NO. 94–67

In *City of Espanola v. Schneider*, the Special Masters found that Judge Castellano acted with apparent bias and prejudice toward the plaintiff. For example, after trial on the merits, Judge Castellano ruled in favor of the defendant, but he thereafter refused to enter a judgment from which plaintiff could appeal. In fact, Judge Castellano appeared to have intentionally delayed ruling in order to force plaintiff to settle the case because plaintiff's interests were dependent upon an approaching extra-judicial deadline. Further, after this Court issued a writ of superintending control ordering entry of a judgment for the defendant so that plaintiff could appeal, Judge Castellano entered an order that expanded the issues litigated, and after this Court reversed that order on the merits, on remand, Judge Castellano refused to award plaintiff any costs, precipitating another appeal. Finally, during the pendency of the proceeding, Judge Castellano asked plaintiff's counsel to prepare a document for the judge's signature opposing a proposed disposition in a related matter before the Court of Appeals.

The Special Masters concluded that Judge Castellano had engaged in conduct that created an appearance of bias and denied a litigant its right to be heard. The Special Masters concluded this conduct violated SCRA 21–100, 21–200, 21–300 ("A judge shall perform the duties of office impartially and diligently."), and SCRA 1986, 1–088.1(D) (Repl.1992) ("No district judge shall sit in any action in which his impartiality may reasonably be questioned.").

### CONCLUSION

Regarding Nos. 94–03 and 94–25, Judge Castellano's challenges in June 1994 were directed at Chief Judge Maes' authority to issue the orders he defied. He contended then that by statute he held equal rank with the other judges in the First Judicial District, *see* NMSA 1978, § 34–6–28 (Repl. Pamp.1990), and that the relevant local rule of the First Judicial District, LR1–203(A), is consistent with that principle, because the local rule provides that the Chief Judge shall consult with the other judges in assigning and reassigning cases.

We resolved the issue of Chief Judge Maes' authority to reassign cases against Judge Castellano when we granted the writ of superintending control for which Frank petitioned. We need not revisit that issue. However, the constitutional amendment on which Judge Castellano has relied, N.M. Const. art. VI, § 34, was part of a judicial reform package that included an amendment

regarding the powers of the chief judge of a judicial district. *See* N.M. Const. art. VI, § 38. Article VI, Section 38 provides as follows: "Each judicial district and metropolitan court district shall have a chief judge who shall have the administrative responsibility for that judicial district or metropolitan court district." We are not persuaded that either the local rule or the statute on which Judge Castellano relies is inconsistent with this constitutional provision. To the extent that either the rule or the statute is inconsistent, of course the constitutional provision prevails. Further, the Commission found, and Judge Castellano does not dispute, that he continued to resist Chief Judge Maes' administrative orders after we issued the writ.

Judge Castellano has argued that there was insufficient evidence to support the charges against him by clear and convincing evidence. However, regarding Nos. 94–03 and 94–25, his appellate argument has not in general challenged specific findings as lacking evidentiary support. In challenging specific findings regarding No. 93–52, Judge Castellano contends that there was

> a total absence of evidence demonstrating that [his] relationship with CASA reflected adversely upon his impartiality or interfered with the performance of his judicial duties. [He] did not have *de facto* control over First CASA; he did not personally select the members of the board of directors; and he did not personally hire and fire its executive directors. [He] did not act in a judicial capacity in his dealings with First CASA and he did not act in bad faith.

Judge Castellano acknowledges that there was conflicting evidence regarding his relationship with the board of First CASA. He contends in effect that the primary witness was impeached and the remaining evidence cannot be characterized as clear and convincing. He concedes that Mrs. Castellano was extensively engaged in fundraising activities on behalf of First CASA, but he contends that there was at the time no prohibition in the Code of Judicial Conduct that prohibited these activities. Thus, he contends there was no clear and convincing evidence that he

personally lent the prestige of his office to the fundraising efforts or conveyed the impression that others were in a special position to influence him. He contends that the timing of the two $1,000 contributions was coincidental. Finally, he argues that there was no evidence that he acted with malice or in his judicial capacity.

There need not be clear and convincing evidence to support each and every one of the Commission's evidentiary findings. Rather, we must be satisfied by clear and convincing evidence that there is willful judicial misconduct which merits discipline. On the ultimate question of Judge Castellano's relationship with First CASA, there had been a prior admonition against fundraising, and that same conduct was repeated. We believe that the issue of the appearance of impropriety had been resolved adversely to Judge Castellano in that prior proceeding and that repetition of the very conduct that had been characterized by the Commission as improper cannot. be said to be anything other than willful judicial misconduct. We recognize that Judge Castellano's wife is an independent person with the right to pursue personal interests. Nevertheless, having been admonished by the Commission, Judge Castellano had an obligation to take steps to ensure the appearance as well as the reality of her independence and of his impartiality. He did not.

Regarding Cause No. 94–67, Judge Castellano argues that there were legitimate case-related reasons underlying his actions as the trial judge. He also argues that in an analogous case, the same defense counsel obtained similar results before a different district court judge. He contends that the evidence did not show judicial misconduct but rather at most erroneous rulings corrected on appeal. *See West Virginia Judicial Inquiry Comm'n v. Dostert*, 165 W.Va. 233, 271 S.E.2d 427, 433–34 (1980). We agree that the Commission might have believed his characterization of the undisputed facts. However, while we are charged with independently evaluating the record for the presence or absence of clear and convincing evidence, we may give weight to the evidentiary findings of those who were able to judge

credibility. *See McCullough v. Commission on Judicial Performance*, 49 Cal.3d 186, 260 Cal.Rptr. 557, 559, 776 P.2d 259, 261 (1989). If the Special Masters did not find Judge Castellano credible, and they did not, then they properly inferred that the judge's conduct in the case, taken as a whole, appeared biased and impartial. That inference is supported by clear and convincing evidence. *Cf. id.* at 563–65, 776 P.2d at 265–66 (failure to submit judgment for six years is persistent failure to perform duties of office); *see also In re Lorona*, 178 Ariz. 562, 875 P.2d 795, 797 (1994) (clear and convincing evidence burden of proof in judicial discipline proceeding can be met even when testimony is conflicting).

■ Whether the discipline that is appropriate is removal or a lesser sanction is separate from the question of whether the evidence supports a determination that the judge's actions constituted willful judicial misconduct. *Compare Furey v. Commission on Judicial Performance*, 43 Cal.3d 1297, 240 Cal.Rptr. 859, 863, 743 P.2d 919, 923 (1987) ("the number and quality of the charges found to be true assumes importance as one of the guidelines we apply in making the difficult decision of discipline") *with Quinn v. State Comm'n on Judicial Conduct*, 54 N.Y.2d 386, 446 N.Y.S.2d 3, 7, 430 N.E.2d 879, 883 (1981) (fact that prior admonition for similar conduct proved ineffective is fact that may be taken into account). When addressing the issue of what discipline is appropriate, we consider the fact that the Commission proved a pattern of behavior that indicates a lack of respect for the constitutional and statutory limitations on a judge's authority. A lesser discipline is not likely to change such a fundamental problem. *Kloepfer v. Commission on Judicial Performance*, 49 Cal.3d 826, 264 Cal.Rptr. 100, 102, 782 P.2d 239, 241 (1989). We note that the abuse of a judge's contempt power and repeated discourtesy toward others has been the focus of other court's decisions to order removal. *See Furey*, 240 Cal.Rptr. at 863–64, 743 P.2d at 923; *Kloepfer*, 264 Cal.Rptr. at 107–08, 117–19, 782 P.2d at 246–47, 256–58. We also consider the fact that two prior closed files reveal analogous conduct. *See Quinn*, 446 N.Y.S.2d at 7–8, 430 N.E.2d at 883. Finally, we consider the strength of the pattern of behavior and its impact on the community, and thus on Judge Castellano's reputation for judicial temperament.

The Commission's findings and conclusions support a determination that Judge Castellano will not be able to change this pattern of behavior in the near future. We are persuaded that the pattern has adversely affected his reputation for impartiality, independence, and integrity. We conclude that removal is the only appropriate remedy. Therefore, we grant the Commission's supplemental petition and order Judge Castellano's removal. The order will be final forthwith. The Commission shall recover its costs.