73 P.3d 197 (2003)
134 N.M. 59
2003-NMSC-017
STATE of New Mexico, ex rel., NEW MEXICO JUDICIAL STANDARDS COMMISSION and Commissioners, Douglas W. Turner, Chair, Lay Member, Teresa G. Chaparro, Vice-Chair, Lay Member, Hon. Frank H. Allen, District Judge Member, Hon. Frank K. Wilson, District Judge Member, Hon. Buddy Hall, Magistrate Judge Member, Kathleen M. Brandt, Esq., Attorney Member, Mark A. Filosa, Esq., Attorney Member, Marie N. Garcia-Shaffner, Lay Member, Daniel H. Houck, Lay Member, Francis McKinney-Ferguson, Lay Member, and James W. Tooke, Lay Member, Petitioners,
v.
Valerie ESPINOSA, Zolene Knott, Esther Marquez, Paul Sena, Dr. Gloria Taradash, and Shirley Williams, Purported Appointees, Respondents, and
Honorable Bill Richardson, Governor of New Mexico, Real Party in Interest.
No. 28,040.
Supreme Court of New Mexico.
July 2, 2003.
*198 Hon. Frank K. Wilson, Alamogordo, NM, for Petitioners.
Patricia Madrid, Attorney General, David K. Thomson, Assistant Attorney General, Santa Fe, NM, for Respondents.
Eugene Zamora, Santa Fe, NM, for Real Party in Interest.

OPINION
MAES, Chief Justice.
{1} Petitioners, members of the Judicial Standards Commission (Commission), filed a petition for a writ of quo warranto with this Court, seeking to stop Governor Bill Richardson from removing the six lay members of the Commission and replacing them with new gubernatorial appointees. We issued a stay of any further business while we determined whether the Governor has the authority to remove prior gubernatorial appointees to the Commission. We hold that Article V, Section 5 of the New Mexico Constitution grants the governor the right to remove and replace lay members of the Commission. We therefore deny the petition for the writ and lift the stay of Commission business.

BACKGROUND
{2} The Commission was created in 1967. Its purpose is "to oversee and investigate the performance, conduct and fitness of members of the judiciary." 1967 Report of the Constitutional Revision Commission at 88. The Commission is made up of 11 members. Two members are district court judges and a third must be a magistrate judge. Those members are appointed by this Court. See NMSA 1978, § 34-10-1(C) (1999). Two members must be lawyers. Those members are appointed by the State Bar Association. See § 34-10-1(B). The other six "citizen" or "lay" members are appointed by the Governor. See § 34-10-1(A). The Commission operates with a system of staggered terms. Each lay Commissioner serves a term of five years. The lay members' terms are staggered such that one term expires each year. Because the sixth lay member was added later, however, two positions will expire June 30, 2004. The terms of the other Commissioners are also staggered.
{3} Shortly after Governor Richardson took office in January 2003, he began removing executive officers, state employees and board members and replacing them with his own appointees. He did so under the power of Article V, Section 5 of the New Mexico Constitution, which gives the Governor the power to remove officials that he has appointed, "unless otherwise provided by law." The Governor also sought to remove the lay members of the Commission who were serving at the time he took office. In March, he sent letters to at least four lay members of the Commission, thanking them for their service but informing them that they were being relieved of their positions. He then appointed six new members to serve on the Commission. The judge and lawyer Commissioners then filed this petition, seeking to prevent Respondents, the Governor's new appointees, from serving as commissioners. They also sought a stay of further Commission meetings until it could be determined which appointees are authorized to serve on the Commission. We granted the stay and agreed to consider the issues raised in the petition.

DISCUSSION
{4} Petitioners seek a writ of quo warranto. An action for a writ of quo warranto may be brought "when any person shall usurp, intrude into or unlawfully hold or exercise any public office...." NMSA 1978, § 44-3-4(A) (1919). "One of the primary purposes of quo warranto is to ascertain whether one is constitutionally authorized to hold the office he claims, whether by election or appointment...." State ex rel. Anaya v. McBride, 88 N.M. 244, 247, 539 P.2d 1006, 1009 (1975). The Governor argues that Petitioners should have sought a writ of mandamus or prohibition to prevent him from removing the existing members, rather than a writ of quo warranto to remove his appointees. *199 We think Petitioners' claim can validly be raised under an action in quo warranto. Even if a different writ would be more appropriate, this Court ultimately needs to decide whether the Governor has the authority to remove sitting members of the Commission before their terms expire. The writ, if granted, would preclude Respondents from taking positions on the Commission.
{5} The Governor, on behalf of Respondents, asserts that he had the authority to remove the lay members of the Commission under Article V, Section 5 of our Constitution, which provides that, "The governor shall nominate and, by and with the consent of the senate, appoint all officers whose appointment or election is not otherwise provided for and may remove any officer appointed by him unless otherwise provided by law." Because the Legislature has imposed no limits on his removal power, the Governor argues that he can remove the lay members of the Commission at will. Petitioners, on the other hand, begin their analysis with Article VI, Section 32 of the New Mexico Constitution, which created the Commission, and its implementing statutes, NMSA 1978, § 34-10-1 through -4. At the core of their arguments is that the Commission must be an independent body free from political influence. Their claims involve the interpretation of both statutes and constitutional provisions, and our review is therefore de novo. See Georgia O'Keefe Museum v. County of Santa Fe, 2003-NMCA-003, ¶ 27, 133 N.M. 297, 62 P.3d 754; Bd. of Comm'rs v. Greacen, 2000-NMSC-016, ¶ 4, 129 N.M. 177, 3 P.3d 672.
{6} Article VI, Section 32 provides that:
There is created the `judicial standards commission,' consisting of two justices or judges, one magistrate and two lawyers selected as may be provided by law to serve for terms of four years, and six citizens, none of whom is a justice, judge or magistrate of any court or licensed to practice law in this state, who shall be appointed by the governor for five-year staggered terms as may be provided by law. If a position on the commission becomes vacant for any reason, the successor shall be selected by the original appointing authority in the same manner as the original appointment was made and shall serve for the remainder of the term vacated.
As noted above, § 34-10-1 provides for the appointment of the 11 members. Nothing in the implementing statutes expressly provides for the removal of Commission members once they are appointed. Similarly, nothing in Article VI, Section 32 expressly allows for the removal of Commission members.
{7} Because the commissioners have designated terms, this is not a situation in which the right of appointment carries an implied right of removal. See Adie v. Mayor of Holyoke, 303 Mass. 295, 21 N.E.2d 377, 380-81 (1939) ("[T]he right of removal does not exist in the appointing power, in the absence of some constitutional or statutory provision, where the term of the official is fixed by law for a definite period."). The Governor seems to argue that removal power is implied because the appointing authorities can fill a position if it becomes vacant "for any reason." We do not agree. In another case involving the removal of executive appointees, we explained that "[a] vacancy occurs when an appointee leaves office before the completion of his or her constitutional or statutory term." Denish v. Johnson, 1996-NMSC-005, ¶ 16, 121 N.M. 280, 910 P.2d 914 (emphasis omitted). We do not think this includes involuntary removal by the appointing authority. In addition, the Legislature has defined the term vacancy in NMSA 1978, § 34-10-2 (1968), which provides that: "Whenever any member of the judicial standards commission dies, resigns or no longer has the qualifications required for his original selection, his position on the commission becomes vacant." This statute was passed by the Legislature immediately after the Commission was created. "A contemporaneous construction by the legislature of a constitutional provision is a safe guide to its proper interpretation[] and creates a strong presumption that the interpretation was proper." State ex rel. Udall v. Colonial Penn Ins. Co., 112 N.M. 123, 129, 812 P.2d 777, 783 (1991) (internal quotations and citation omitted). We do not think any of the appointing authorities have the power to create a vacancy by removing one of the Commissioners *200 from his or her position. For that reason, we agree with Petitioners that neither Article VI, Section 32 nor its implementing statutes provides a mechanism for the removal of Commission members.
{8} The Governor, however, is constitutionally endowed with a power that neither this Court nor the State Bar have been granted. The question before us is whether the power granted to the Governor under Article V, Section 5 extends to the lay positions on the Judicial Standards Commission. Petitioners raise two main arguments against extending the Governor's authority under Article V, Section 5 to the executive appointees on the Commission. They argue that allowing the Governor to remove lay members of the Commission would violate the separation of powers. They also argue that the text of Article VI, Section 32 prohibits the removal of Commission members before the end of a designated term. We address each argument in turn.

Separation of Powers
{9} Article III of our Constitution declares that:
The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others, except as this constitution otherwise expressly directed or permitted.
In this case, our Constitution expressly permits the encroachment of the executive branch into the judicial branch. The Judicial Standards Commission is a creature of the judicial branch. The constitutional provision creating the Commission is found in Article VI, which is the article addressing the judicial department. Its purpose is to investigate accusations against members of the judiciary. Yet Article VI, Section 32 allows the Governor to appoint the majority of members to the Commission. The history of the Commission's creation explains why.
{10} The Commission was created by constitutional amendment in 1967. The idea to create the Commission was first recommended to Governor Campbell in 1964, then again to Governor Cargo in 1967. The commentary in the 1964 Report of the Constitutional Revision Commission explains that the judiciary lacked an "appropriate judicial disciplinary machinery." 1964 Report of the Constitutional Revision Commission at 116. At the time, impeachment was the sole method of removing a judge from office, while the Board of Bar Commissioners maintained its disciplinary authority over judges as members of the bar. Petition of Bd. of Comm'rs of State Bar, 65 N.M. 332, 333, 337 P.2d 400, 401 (1959). The Report observed that "The present system of reliance upon impeachment as the exclusive method of supervision of conduct of judges during their term of office is inadequate and should be supplemented [by an] independent commission of laymen, judges and lawyers." 1964 Report of the Constitutional Revision Commission at 117. The report filed in 1967 elaborated on this need, explaining that "In order to achieve an efficient and well disciplined judicial system possessing the highest degree of integrity, it is felt that an independent commission is necessary to oversee and investigate performance, conduct and fitness of members of the judiciary." 1967 Report of the Constitutional Revision Commission at 88.
{11} Thus, the Commission was assigned the role of watchdog for the judiciary. The Commission was given the authority to investigate allegations against judges and to make recommendations to this Court, which determines the proper disposition of each case. See Article VI, Section 32. Although the Commission was created as part of the judicial branch, the drafters determined it would be appropriate for the Governor to appoint a majority of the Commissioners. It also mandated that one of the executive appointees serve as the chair. See id. Thus, the Constitution expressly provides that the executive branch play this specific role in the policing of the judiciary.
{12} Petitioners argue that the Governor's removal of the executive appointees represents a further encroachment into the *201 judicial branch beyond that expressly permitted in our Constitution. An unconstitutional "infringement occurs when the action by one branch prevents another from accomplishing its constitutionally assigned function." State ex rel. Taylor v. Johnson, 1998-NMSC-015, ¶ 23, 125 N.M. 343, 961 P.2d 768. We are not convinced that allowing the Governor to replace executive appointees on the Commission would represent a further encroachment on the judicial branch.
{13} The function of the judiciary is to construe laws and render judgments in the cases that come before it. "The essence of judicial power is the final authority to render and enforce a judgment." Otero v. Zouhar, 102 N.M. 493, 502, 697 P.2d 493, 502 (Ct.App. 1984). The Commission itself plays no role in these functions; it neither construes laws nor renders judgments. Nor does the Commission have the power to remove or sanction judges. It acts as an advisory body, and makes recommendations to this Court, which has the final decision making authority. The United States Supreme Court faced a similar situation when examining the constitutionality of the United States Sentencing Commission. See Mistretta v. United States, 488 U.S. 361, 380-86, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). The Court observed that: "The Sentencing Commission unquestionably is a peculiar institution within the framework of our Government. Although placed by the Act in the Judicial Branch, it is not a court and does not exercise judicial power. Rather the Commission is an independent body. . . ." Id. at 384-85, 109 S.Ct. 647. Similarly, the drafters proposing the creation of the Commission stressed the need for the Commission to act as an independent body. Because the Commission plays no role in the traditional functions of the judiciary, the Governor's actions do not infringe on the judiciary's performance of those functions.
{14} Nonetheless, the Commission is constitutionally committed to the judicial branch. For that reason, we think the functions of the Commission itself are now judicial functions. Petitioners argue that allowing the Governor to remove and replace the executive appointees would infringe upon the independence of the Commission. Petitioners raise the possibility that "an unhappy, but politically well-connected, target of an investigation calling the Governor to influence the Commission." They envision future governors removing all six executive appointees as a means to force the Commission to either halt or instigate an investigation.[1]
{15} We recognize that such a situation, though unlikely, would be unfortunate. The Constitution, however, intentionally grants lay members the majority of seats on the Commission. This was perhaps designed to preserve the Commission's independence by preventing members of the judiciary from unduly influencing the investigations of the Commission. We do not think the amount of control given to the executive branch increases if the Governor is allowed to replace the six executive appointees. Even with removal power, the Governor's role remains limited to the appointment of six members of an 11 member board, while this Court retains the ultimate decision making authority. In addition, as Petitioners themselves point out, the Commission works in near total confidentiality. The Governor has no access to the complaints filed before the Commission unless and until they are made public when a recommendation is made to this Court. Thus, the Governor will not be in a position to interfere with an ongoing investigation, and our Constitution has thereby provided another check on potential abuse of power.
{16} An actual attempt to influence the actions of the Commission would be an attempt to control the judiciary and, therefore, a violation of separation of powers that would be a different matter. Cf. Horton v. McLaughlin, 821 A.2d 947, 952 (N.H.2003) ("Finally, we address the petitioners' assertion that the legislative impeachment process as carried out threatens the independence of the judiciary. . . . To subject a judge to financial *202 hardship in defending himself or herself from impeachment or removal proceedings motivated, for example, by unpopular decisions could significantly jeopardize the separation of powers doctrine as well as the requirement that a judge act independently. On this record, however, we find no such substantive constitutional violation.") (citation omitted). There is no evidence of such an attempt in this case.
{17} Finally, while it is possible a governor could abuse the removal power in an attempt to control the Commission, we think it more likely a governor would use the power to remove a Commissioner whose performance is inadequate. If we were to conclude that Article V, Section 5 does not apply to the Commission, however, then the Governor would have no means to remove such Commissioners.[2] It is also not clear where the line between constitutional and unconstitutional action would fall. If we were to conclude that the removal of all six lay members at once violated the separation of powers because it might allow the Governor to control the Commission, would the same consideration apply if the Governor sought to remove only one member? Would the Governor's motive determine the outcome? And if we conclude that the Governor is constitutionally prohibited from removing members, would that mean that the Legislature could not provide a mechanism for removal, as it has with various executive boards? While we recognize the possibility that the Governor could exert undue influence over the Commission, we do not think the Governor has infringed on the functions of the judiciary by removing the executive appointees from the Commission.

Article VI, Section 32
{18} Having concluded that the Governor's removal of Commissioners would not violate the separation of powers doctrine, we must still determine whether the text of the Constitution permits such removal. The Petitioners recognize that the power to remove Commissioners is not expressly denied, but they argue that the text of Article VI, Section 32 impliedly limits the Governor's removal power. They first observe that the six commissioners appointed by the Governor serve staggered terms. They argue that the Governor's power to remove appointees is limited when a system of staggered terms is in place.
{19} We discussed the proper functioning of a system of staggered terms in Denish. In that case, Governor King filled two mid-term vacancies on the Board of Regents for the New Mexico Institute of Mining and Technology. Denish, 1996-NMSC-005, ¶¶ 1-5, 121 N.M. 280, 910 P.2d 914. He attempted to grant the new appointees five-year terms, even though each term would expire earlier under that board's system of staggered terms. We held that the Governor's appointees could only serve for the remainder of the unexpired term. Id. ¶ 41. In other words, to preserve a formal system of staggering, the terms themselves could not be varied. We explained that "[s]taggered terms preserve continuity in the public entity by preventing the theoretical possibility of all appointees being replaced at once. This continuity ensures that there will be no erratic changes in the entity's policies." Id. ¶ 40. In addition, we observed that, "[t]hough individual members may be pressured, this staggering tends to insulate the public entity as a whole from being manipulated for political reasons." Id.
{20} Petitioners rely on this discussion from Denish to argue that the use of a staggered term system prevents the Governor from removing executive appointees before the end of their terms have expired. They argue that "[a] provision which creates staggered terms is meaningless if the appointees can be removed at will." We agree to some extent. In this case, the system of staggered terms will technically be preserved. The new Commission appointees will serve the unexpired term of the replaced Commission member and thus preserve the status of the staggered term system. Nonetheless, six out of 11 members will change at *203 one time, and we agree that such a wholesale change does undermine the purpose of the staggered term system.
{21} In response to Petitioners' arguments, however, the Governor observes that almost every executive board or commission has staggered terms. See, e.g., NMSA 1978, § 61-9-5(A) (1996) (creating a system of staggered terms for the state board of psychologist examiners). If we interpreted the mere use of staggered terms to limit the Governor's removal power, such a holding would extend to all those boards and commissions. When creating many of the state's various boards and commissions, however, the Legislature has provided for both staggered terms and gubernatorial removal power. Thus, the Legislature does not view a governor's removal power under Article V, Section 5 as inconsistent with the purpose of staggered terms. We do not think the language in Denish can be read to hold that the Governor can never remove an appointed official from a board or commission that has staggered terms. Denish was dealing with an attempt to alter the length of the terms themselves; it did not deal with mid-term removal of appointees. Thus, while we continue to recognize the value of staggered terms, we do not think Denish precludes the removal of appointees who are serving staggered terms.
{22} A comparison between Article VI, Section 32 and other constitutional provisions also shows that the use of staggered terms is not sufficient to limit the Governor's removal power under Article V, Section 5. As we described in Denish, the provisions creating the various boards of regents implemented a system of staggered terms. See N.M. Const. art. XII, § 13. Yet that section also contains language expressly limiting the Governor's removal power. See id. No such language would be necessary if the use of staggered terms alone was sufficient to limit that power. Similarly, members of the State Highway Commission serve staggered terms, but the drafters of the Constitutional provision creating that commission felt it necessary to provide an express limit on the Governor's power to remove commissioners. See N.M. Const. art. V, § 14. We cannot assume that the use of staggered terms alone limits the Governor's removal power. While the policies underlying staggered terms are important, such policies cannot override the Governor's express removal authority.
{23} Petitioners similarly argue that a limit should be implied from the provisions dealing with vacancies on the Commission. Because the language only provides a means for the Governor to fill a vacancy, they argue, the intent must be to deny the Governor the authority to remove members. The Legislature, however, frequently addresses both the power to fill a vacancy and the power to remove an appointed official. See, e.g., NMSA 1978, § 61-15-3(C) & (D) (1987) (providing that the Governor may fill vacancies on board of examiners for architects, and may also remove members for neglect of duty and incompetence). We similarly read Article V, Section 5 and Article VI, Section 32 as harmonious constitutional provisions. See State v. Sandoval, 95 N.M. 254, 256, 620 P.2d 1279, 1281 (1980) (stating that constitutional provisions should "be read together and harmonized in their application if possible"). Article VI, Section 32 addresses the power to fill a vacancy. Article V, Section 5 addresses the power to remove Commissioners. The two powers are not mutually exclusive, and one does not negate the other.
{24} Moving away from the specific language of Article VI, Section 32, Petitioners argue that the limit on the Governor's authority is inherent because removal power would be "abhorrent to the purpose of the Judicial Standards Commission." They stress that the Commission must be independent from political influence. We certainly agree that the Commission should be protected from political interference so that it can conduct its investigations without fear of reprisal. We think, however, that this Court should not limit the scope of the Governor's authority by implying a limit on his removal power.
{25} The fundamental flaw in Petitioners' argument is that they are attempting to use implied terms to negate the Governor's express removal authority. See Flaska v. State, 51 N.M. 13, 20, 177 P.2d 174, 178 *204 (1946) ("It is presumed that the people expressed themselves in careful and measured terms in framing the constitution and that they left as little as possible to implication." (citation and internal quotation marks omitted)). The voters of this State gave to the Governor the authority under Article V, Section 5 when our Constitution was first passed in 1911. The provision initially allowed the Governor to remove public officers for "incompetency, neglect of duty or malfeasance in office." Several years later, this Court upheld the Governor's power to remove two state tax commissioners who had been appointed to six-year terms. State ex rel. Ulrick v. Sanchez, 32 N.M. 265, 289, 255 P. 1077, 1086 (1926). We emphasized that the Governor must have control over administration, as "[i]t is the Governor, the chief executive, who is held responsible to the sovereignty for errors in his executive and administrative policies." Id. Later, we held that the Governor need not provide notice and a hearing unless the Legislature has expressly required such safeguards. See State ex rel. Duran v. Anaya, 102 N.M. 609, 611, 698 P.2d 882, 884 (1985). We observed that, if the Legislature wanted to require notice and a hearing, it "could have included these provisions in the statute." Id.
{26} Both Ulrick and Duran dealt with executive officers, rather than appointees who in fact serve under the judiciary. Nonetheless, those cases indicate that the Governor has plenary authority to remove his appointees unless the Legislature has imposed an express limit on that power. In 1988, the voters of this state broadened the Governor's authority, eliminating the requirement that the Governor allege "incompetency, neglect of duty or malfeasance" in order to remove an appointed official. Those drafting this amendment observed that "the existing bases for removal forced previous governors to develop a case against an appointee in order to remove the person from office." New Mexico Legislative Council Service, "Constitutional Amendments Proposed by the Legislature in 1988 and Arguments For and Against." June 1988, 203.2, at 7-8. They explained that "[a] governor must have the power to remove appointees without fear of prolonged legal challenges to the removal and the media exposure that goes along with these public dismissals." Id. at 8.
{27} Without a compelling reason to hold otherwise, we must conclude that Article V, Section 5 applies to the executive appointees on the Commission. The voters did not limit the Governor's authority to specific appointees. The removal authority applies indiscriminately to all gubernatorial appointees. Even in this case, where the executive appointees serve on a commission that exists within the judicial branch, we think a limit on the Governor's removal power must be expressly stated. We will not imply a limit on the Governor's removal power from miscellaneous phrases within Article VI, Section 32 that do not expressly limit his power.
{28} Because Article V, Section 5 gives the Governor the discretionary power to remove officers whom he appoints "unless otherwise provided by law," that law must come from the Constitution or legislation. The drafters of Article VI, Section 32 could have addressed the Governor's removal power if they wanted to limit that power. We presume that they were aware of existing law, including Article V, Section 5, at the time they drafted the provisions of Article VI, Section 32. In fact, when creating the State Highway Commission in 1967, at the same time the Judicial Standards Commission was being created, the drafters included a provision indicating that "[n]otwithstanding the provisions of Article 5, Section 5 of the constitution of New Mexico, state transportation commissioners shall only be removed as provided by law." N.M. Const. art. V, § 14. The drafters of Article VI, Section 32 could have easily included similar language to limit the removal of executive appointees to the Commission.
{29} Similarly, for many executive boards the Legislature has exercised its authority to expressly limit the Governor's removal power. It has done so by specifying the reasons for which an appointee can be removed, or by requiring notice and a hearing prior to removal. As one of many examples, members of the lottery authority "may be removed by the governor for malfeasance, misfeasance or willful neglect after reasonable notice and a *205 public hearing unless the notice and hearing are expressly waived in writing by the member." NMSA 1978, § 6-24-5 (1995). For some entities the Legislature has required the consent of two thirds of the Senate. See NMSA 1978, § 52-9-5 (1991) (employers mutual company board of directors); NMSA 1978, § 58-29-5 (2001) (small business investment corporation). By imposing a similar limit on the Governor's removal power, the Legislature could prevent future governors from making wholesale changes to the Commission while at the same time allowing for removal for cause.
{30} The Legislature has not limited the Governor's removal authority for the Commission. The Legislature's silence may be purposeful. The Legislature may have believed that its silence safeguarded the Governor's removal authority, as the Constitution requires the Legislature to speak on the issue. For that reason, we think this Court would be overstepping its bounds to impose a limit on the Governor's removal authority when the Legislature has imposed none. The Legislature, however, may not have considered the possibility that a governor would remove all six lay appointees at one time. No prior governor has attempted to make a wholesale change in the lay membership on the Commission. The Legislature, therefore, might not have recognized that the Governor's removal power posed a threat to the independence of the Commission.
{31} If indeed the legislative silence is merely an oversight, then it is the Legislature, and not this Court, that should step in now to protect this Commission from future interference. The Legislature is in a position to exercise its authority under Article V, Section 5 to limit the Governor's removal authority, thereby protecting the Commission from another wholesale change in its lay membership, and thereby properly preserving the system of staggered terms.[3] After the benefit of lobbying, public participation and public debate, the Legislature can decide whether and to what extent a governor's removal authority regarding the Commission may be limited. In the absence of any express limit within the language of Article VI, Section 32 and any express limit imposed by the Legislature, we must conclude that the Governor's removal power extends to the executive appointees on the Commission.
{32} There is an additional way in which the Legislature could continue to ensure that the Commission fulfills its mission of overseeing judicial conduct. In fiscal year 2002, the Commission received 923 complaints. The Commission currently has one executive director and three staff members charged with investigating all of these complaints. The lack of funding to this body may pose a greater threat than the Governor's recent action. Unfortunately, events in recent years have shown the harm that can be caused by judges who are no longer qualified to perform their duties. We urge the Legislature to consider the important role the Commission plays in ensuring that we have a reliable and trustworthy judiciary, and evaluate the proper level of funding needed for the Commission to fulfill its mission.
{33} We deny Petitioners' request for a writ of quo warranto, and we lift the stay of Commission business.
{34} IT IS SO ORDERED.
WE CONCUR: EDWARD L. CHAVEZ, Justice, PATRICIO M. SERNA, Justice (Specially Concurring).
SERNA, Justice (specially concurring).
{35} I concur with the majority opinion without reservation. I write separately simply to emphasize my rationale. I took an oath to uphold our Constitution, and today, I reaffirm that sacred oath. There can be no doubt that the Supreme Court must keep our State true to its Constitution. The dissent contends that "we are confronted with a conflict between two separate sections of the Constitution." I, however, see no conflict. The deciding factor that led me to join the majority opinion, which I find wholly sound and persuasive, is the well-established and fundamental rule of constitutional law that if *206 the Constitution can be read in a harmonious fashion-as indeed it can be in this case-then it must be so construed. "We presume the drafters of the Constitution intended to construct a synchronous and stable foundation for the State's legal system. It is generally possible to construe the State Constitution as an integrated whole rather than as groupings of isolated and discordant rules." Denish v. Johnson, 1996-NMSC-005, ¶ 32, 121 N.M. 280, 910 P.2d 914.
{36} The present situation cries out for "legislative therapy, not judicial surgery." State v. Leiding, 112 N.M. 143, 146, 812 P.2d 797, 800 (Ct.App.1991). "[I]t is the particular domain of the legislature, as the voice of the people, to make public policy." Torres v. State, 119 N.M. 609, 612, 894 P.2d 386, 389 (1995). Justice Minzner believes that any mistake in constitutional construction cannot be corrected by the Legislature and relies on the importance of continuity and stability on the Commission. I respectfully disagree. Article V, Section 5 provides for removal power "unless otherwise provided by law." Therefore, if there are policy reasons to limit the Governor's power of removal for members of the Commission, such as continuity and stability on the Commission, the restriction of the Governor's power is expressly within the province of the Legislature, not this Court. I am confident that the legislative branch will expeditiously address the matter if indeed it is deemed necessary.
{37} Justice Minzner points out that the Governor has not identified a policy-making function of the Commission that his removal power would serve. Similarly, Justice Bosson emphasizes that the Commission does not serve a policy-making role. Again, I must respectfully disagree. Article V, Section 5 contains no limitation on the Governor's removal power based on the functions served by the appointee. The Governor "may remove any officer appointed by him." N.M. Const. art. V, § 5 (emphasis added). It is indisputable that the Commission members removed in this case were gubernatorial appointees. Therefore, it is not necessary to decide whether these members served an executive function. Even if this were a valid consideration, however, we would not assess whether the Commission performs a "policy-making function," as the dissents do, because the core function of the executive branch is not making policy but executing it. See N.M. Const. art. V, § 4 (stating that the Governor "shall take care that the laws be faithfully executed"). In this context, while the Commission is empowered to conduct a hearing and make findings and recommendations, the Commission's duties under Article VI, Section 32 also include investigation and, by filing a petition for discipline, retirement, or removal, Rule 27-301(A) NMRA 2003, quasi-prosecution. As a result, the Commission's powers are as much quasi-executive as they are quasi-judicial.
{38} In her dissent, Justice Minzner argues that the Commission acts as a trial court and that this Court's role in reviewing the Commission's recommendation is as an appellate court. I must respectfully disagree. The Commission does not exercise judicial power. Article VI, Section 1 of the New Mexico Constitution provides that "[t]he judicial power of the state" rests with the various courts in the judiciary and with the Senate in the limited setting of impeachment. The Commission is not included in this list. Moreover, even by analogy, the Commission has no adjudicative power; it cannot enter or enforce a judgment, does not construe or declare the law, and has no inherent judicial powers, such as the power to hold those appearing before it in contempt, see Rule 27-305(A) NMRA 2003 (providing for the Commission's application to this Court for assistance in the event of a willful failure to cooperate with or obstruction of Commission proceedings). The Commission serves only an advisory and investigative role and exercises none of the core judicial functions that are embodied in Article VI, Section 1. This Court retains the ultimate power to discipline, remove, or retire a judge. As a result, the Governor's power of removal over his appointees does not violate the principle of separation of powers because it does not prevent the judicial "branch from accomplishing its constitutionally assigned functions," State ex rel. Taylor v. Johnson, 1998-NMSC-015, ¶ 23, 125 N.M. 343, 961 P.2d 768, and "the essential attributes of judicial power, vis-a-vis other governmental branches *207 and agencies, remain[s] in the courts." Bd. of Educ. of Carlsbad Mun. Sch. v. Harrell, 118 N.M. 470, 484, 882 P.2d 511, 525 (1994).
{39} Further, unlike appellate review of a district court's judgment, which envisions significant deference on factual matters, this Court may accept, reject, or modify both the Commission's findings and its conclusions. While we may give weight to evidentiary findings and credibility assessments by the Commission or its appointed masters, we are not bound to do so. The fact that the Constitution allows this Court to "permit the introduction of additional evidence" in reviewing a recommendation of the Commission, N.M. Const. art. VI, § 32, conclusively establishes that this Court does not act in an appellate role. We decide the question of judicial discipline as an original matter, and until we do so, there is no enforceable judicial order that binds the parties to the proceeding.
{40} For these reasons, I conclude that it is proper to deny the Petitioners' request for a writ of quo warranto. Thus, I join the majority opinion.
BOSSON, Justice (dissenting).
{41} Respectfully, I must dissent from the majority opinion. I also concur fully in Justice Minzner's dissent. I believe the Governor's appointment authority in regard to the Judicial Standards Commission is limited by N.M. Const. art. VI, § 32, to appointments at the expiration of a designated term or appointments to fill vacancies created during the interim in accordance with existing law, the Commission being outside the executive branch of government. Accordingly, I would grant a permanent writ of quo warranto.
{42} At its core, the Commission's argument centers on its essential need for independence, an independence which is, in my judgment, implicit in the Constitution and which precludes any wholesale change of membership, whether by a governor or any other appointing authority. In support of its claim to independence, the Commission emphasizes its quasi-judicial functions, which include investigating complaints against judges throughout the state and, when appropriate, recommending their removal to the Supreme Court.
{43} The majority, however, is persuaded by Respondents' reliance on Article V, Section 5 of the Constitution, which provides: "The governor shall nominate and, by and with the consent of the senate, appoint all officers whose appointment or election is not otherwise provided for and may remove any officer appointed by him unless otherwise provided by law." Because all six of the Commission's lay members are subject to gubernatorial appointment, the majority holds that they are equally subject to "indiscriminate[]" gubernatorial removal, at the Governor's discretion.
{44} Respondents emphasize that nothing in Article VI, Section 32, or in any implementing statute of the Commission, expressly restricts the Governor's authority to "remove any officer appointed by him[,]" pursuant to Article V, Section 5. The Commission, on the other hand, argues that the Governor's Article V, Section 5 appointment authority is limited by the terms of Article VI, Section 32. Thus, we are confronted with a conflict between two separate sections of the Constitution, one within Article V, which sets forth the powers of the "Executive Department," and one within Article VI, which sets forth the powers of the "Judicial Department." The answer, I think, lies at least partially in the Commission's lineage.
{45} As the majority discusses, the Constitutional Revision Commission determined that the way to create "judicial disciplinary machinery" was to establish an independent, non-political entity that could investigate and recommend removal of corrupt and incompetent judges, without the political burdens and obstacles of the impeachment process. Elaborating on the need for a commission with independence, the 1967 Report stated: "In order to achieve an efficient and well disciplined judicial system possessing the highest degree of integrity, it is felt that an independent [judicial standards] commission is necessary to oversee and investigate the performance, conduct and fitness of members of the judiciary." 1967 Report of the Constitutional Revision Commission at 88; see also Petition of Bd. of Comm'rs of State Bar, 65 *208 N.M. 332, 337 P.2d 400 (1959) (holding that impeachment, not a complaint by the Board of Bar Commissioners, was the sole method of reviewing a judge for cause under the Constitution). Continuing on the need for independence, the 1967 Report stated:
Not only is the independence of the judiciary protected, but we are convinced that the strength and capability of the judicial branch of the government is greatly enlarged. The essence of such a body, functioning and able to be used if and when necessary, is an effective element in the strengthening of the judicial system and in leading to a higher standard of judicial conduct.
Id. at 90, 337 P.2d 400. See generally Joseph Michael Norwood, Constitutional RevisionJudicial Removal and DisciplineThe California Commission Plan for New Mexico?, 9 Nat. Resources J. 446 (1969).
{46} To realize this goal of an independent "judicial disciplinary machinery," Article VI, Section 32 and its implementing statutes created a commission of both professional and lay membership. Commission action on disciplinary complaints requires concurrence of the majority of the full membership, with both the position of chairman and the majority of votes reposed in the lay membership. The five professional members are appointed to four-year staggered terms, two judges and a magistrate by the Supreme Court and two lawyers by the State Board of Bar Commissioners. Lay members, who may not be judges or lawyers, are appointed by the governor to five-year staggered terms. No more than four of the six lay positions may be from the same political party. N.M. Const. art. VI, § 32; NMSA 1978, § 34-10-1 (1999). Article VI, Section 32 is supplemented by statute: Section 34-10-1, which implements the terms of the commissioners and provides for their appointment, NMSA 1978, § 34-10-2 (1968), which provides for appointments to fill vacancies, NMSA 1978, § 34-10-2.1 (1977), which sets forth the duties, responsibilities and powers of the Commission, and NMSA 1978, §§ 34-10-3, -4 (1974), which authorizes the Commission to appoint an executive director.
{47} Article VI, Section 32 provides that lay members are appointed by the Governor for "five-year staggered terms as may be provided by law." Section 34-10-1(A) provides for the staggered-term appointment of initial lay members (each appointed for a term of different years) and stipulates, thereafter, that these positions shall be filled "in such a manner that one term expires on June 30 each year."
{48} The Constitution's express choice of staggered terms is significant. It puts in place what we have previously described as a "formal system of staggered terms," the objective of which "is the perpetuation of a rigid staggering plan" by ensuring that vacancies unfold in an organized, pre-determined fashion. Denish v. Johnson, 1996-NMSC-005, ¶ 38, 121 N.M. 280, 910 P.2d 914. In Denish, unlike the present case, the constitutional section at issue did not use the express language, "staggered terms," but this Court was not deterred; we recognized that same intent from the language employed. We stated that a staggered-term system is designed to preserve continuity and stability "by preventing the theoretical possibility of all appointees being replaced at once." Id. ¶ 40. As one of its virtues, a formal system of staggered terms "tends to insulate the public entity as a whole from being manipulated for political reasons." Id. Staggering also promotes "institutional memory by assuring that older appointees have the opportunity to pass on important knowledge and experience to newer appointees." Id.; see also Commonwealth v. Singley, 481 Pa. 367, 392 A.2d 1337, 1340 (Pa.1978) (holding that newly-elected mayor did not have the power to remove and replace, at his pleasure, two redevelopment authority officers appointed by his predecessor, and noting that "creating fixed, staggered terms of office demonstrates a legislative intent to deny the mayor the right to remove, at his pleasure, members of the Redevelopment Authority").
{49} Thus, a formal provision for staggered terms, when inscribed indelibly in the Constitution, represents a deliberate choice by the people to limit turnover in the Commission's membership. Like any choice, it *209 comes at a cost. In the name of achieving stability and independence, the Constitution limits the prerogatives of the appointing authority. Members may be replaced at the conclusion of a term, whenever a position becomes vacant "for any reason," N.M. Const. art. VI, § 32, or "whenever a member dies, resigns or no longer has the qualifications required for his selection.," NMSA 1978, § 34-10-2 (1968). See also NMSA 1978, § 10-16-3 (1993) (describing ethical principles of conduct for public officers). However, the choice of staggered terms strongly suggests that commission members cannot be replaced at any time for any reason. Especially when considered in combination with the Commission's quasi-judicial mission and its irrefutable need for independence, it suggests that any wholesale replacement of commission members prior to the expiration of their terms would be antithetical to the letter and spirit of the Constitution. Any other interpretation of staggered terms, such as that offered by the majority, reduces it to constitutional insignificance, a mere formality, easily subverted, and along with it the Commission's independence.
{50} On its face, Article V, Section 5 of the New Mexico Constitution grants the Chief Executive plenary power over his appointees, including the power to replace those appointees at will "unless otherwise provided by law." In prior decisions of this Court, we have recognized the breadth of that authority. See State ex rel. Duran v. Anaya, 102 N.M. 609, 698 P.2d 882 (1985) (upholding the Governor's constitutional authority to replace appointees to the State Board of Barber Examiners prior to the expiration of their stated terms); State ex rel. Ulrick v. Sanchez, 32 N.M. 265, 255 P. 1077 (1926) (upholding the Governor's constitutional authority to replace the associate commissioner of the State Tax Commission, before the expiration of his term, who had been appointed by the Governor with the advice and consent of the senate); see also Mitchell v. King, 537 F.2d 385 (10th Cir.1976) (interpreting New Mexico state law and upholding the Governor's power to replace a member of the State Museum Board of Regents appointed to a fixed term).
{51} The majority acknowledges that the appellate cases interpreting Article V, Section 5, on which it relies, address gubernatorial power over executive officers, rather than appointees to the judicial branch. This should not surprise. Within the context of the executive branch of government, the Governor, as Chief Executive, is responsible for implementing policies for which he is accountable to the people. The Governor "is held responsible to the sovereignty [of the people] for errors in his executive and administrative policies. [Thus t]he appointee is responsible to the chief executive. . . ." Ulrick, 32 N.M. at 290, 255 P. at 1086 (internal quotation marks and citation omitted). Attendant to the Governor's responsibility for executive policy must come the power to implement that policy, including appointment and replacement of executive officers. This is the essential message of our precedent interpreting Article V, Section 5. Nothing in this dissent should be read as advocating any diminution of gubernatorial control over executive branch appointees.
{52} However, the Judicial Standards Commission is different. The Constitution places the Commission within the judicial branch, not the executive. As part of the judicial branch, the Commission's functions are primarily investigative and quasi-judicial; it has no policy-making function, least of all that of implementing polices and initiatives of any single branch of government. This is why the Commission was created to be independent of any exterior influence, not integrated within the overall policy-implementing apparatus of any one branch of government. Thus, the critical distinction between this case and the authorities relied on by the majority lies in the fundamental constitutional principle of separation of powers, as illustrated by Article VI, Section 32. See generally N.M. Const. art. III, § 1 (providing for three distinct and separate branches of government); State ex rel. Taylor v. Johnson, 1998-NMSC-015, 125 N.M. 343, 961 P.2d 768 (addressing separation of powers in the context of holding that the Governor violated doctrine of separation of powers by implementing the type of substantive policy changes reserved to the Legislature).
*210 {53} Over seventy-five years ago, this Court observed that Article V, Section 5 was a creature of the executive branch: "And there are but few state officers appointed by [the Governor], and only his appointees may be removed by him, and apparently most, if not all, of the officers which may be appointed by him are such as have to do with the executive department of the state government." Ulrick, 32 N.M. at 282, 255 P. at 1083. Although the number of executive officers subject to gubernatorial appointment and replacement now number into the thousands, the general observation set forth in Ulrick holds just as true today. Ulrick was written in 1926 by judges who possessed a familiarity with the drafting of our State Constitution. That opinion concerns the power of the Governor over officers within the executive branch. There can be little doubt that Article V, Section 5 originated from concerns over the executive branch. Before now, no one has ever sought to extend Article V, Section 5 beyond the parameters of the executive branch, and with good reason. See Lunding v. Walker, 65 Ill.2d 516, 3 Ill.Dec. 686, 359 N.E.2d 96, 98-101 (Ill.1977) (holding that governor can only remove election board member for cause, and distinguishing between officers whose function is part of the executive branch and those whose tasks require freedom from executive interference).
{54} The majority, focusing on the precise language utilized in Article V, Section 5, emphasizes that, from time to time, the Legislature has "otherwise provided by law" to restrict the Governor's plenary power to replace appointees, such as requiring a showing of cause. See, e.g., NMSA 1978, § 67-3-5 (1967) (providing that highway commissioners shall not be removed except for incompetence, neglect of duty or malfeasance in office). At times, similar restrictions have been engrafted into the Constitution. See N.M. Const. art. XII, § 13 (restricting the Governor's power to remove members of the Board of Regents). The majority emphasizes that the Legislature has never seen fit to "otherwise provide" and restrict the executive power to appoint or remove members of the Commission. Therefore, by negative implication and in the absence of such express restriction, the majority contends that Article V, Section 5 must apply to the Governor's power of appointment of members to the Commission.
{55} If the Commission were just another executive agency, the argument might be persuasive. The scope of executive powers under Article V, Section 5 with respect to the executive branch of government is broad, and appropriately so. But when the Governor's appointment authority is directed to the Commission as a member of the judicial branch, then Article V, Section 5 must be read in light of the language and intent of Article VI, Section 32. Having created the Commission in such an independent fashion, the people, by their very vote, have insulated the Commission from the ordinary executive business of Article V, Section 5. Having participated in the Commission's creation in this very independent form, the Legislature need not repeat itself by statute.
{56} Finally, I cast my vote as I do, regardless of the benign motives of this Governor or any other appointing authority. Indeed, in the constitutional sense, motives are irrelevant to our analysis. Either the Constitution tolerates the power to replace Commission members at will, or it does not. In interpreting the Constitution, we write for the future, not just the present. Wholesale replacement of Commission members will subject future Commissions to the unfettered control of one political office. Once ratified, however improvidently by this Court, that power may be exercised for good or for ill by future governors. The very principle of separation of powers is built on a premise, tested by time and experience, that takes into account the worst as well as the best of mankind. Absent some express exception in the Constitution, that principle should inform our decision and, in my judgment, requires us to delimit executive authority in this special circumstance. For that reason, I respectfully dissent from the majority opinion and would vote to grant the writ.
I CONCUR: PAMELA B. MINZNER, Justice.
*211 MINZNER, Justice (dissenting).
{57} I fully concur in Justice Bosson's dissent. I write separately only to emphasize my disagreement with the arguments advanced by counsel in opposition to a writ of quo warranto. For the reasons that follow, I believe acceptance of those arguments will result in an infringement upon the powers and responsibilities of both the Legislature and the Judiciary. For the reasons contained in Justice Bosson's dissent and for the reasons that follow, I also respectfully dissent.
{58} The arguments for and against the writ begin in different places; each argument, while acknowledging the other, focuses on a different section of the New Mexico Constitution. The placement of the Commission within Article VI, which generally describes the judicial branch of government, is of significance in evaluating the arguments in favor of and those against the writ of quo warranto. Our precedent and our rules reflect a perception that the Commission, while an independent entity, supports the constitutional responsibilities and powers of this Court. Only the argument in favor of the writ perceives the placement of the Commission within the part of the Constitution that addresses the powers of the judicial branch as significant.
{59} In creating the Commission, the people of New Mexico explicitly provided that "[t]his section is alternative to, and cumulative with, the removal of justices, judges and magistrates by impeachment and the original superintending control of the supreme court." N.M. Const. art. VI, § 32. We construed this provision in In re Castellano, 119 N.M. 140, 143, 889 P.2d 175, 178 (1995), in response to an argument that another constitutional provision "superseded the constitutional authority on which the Commission [had] relied in petitioning this Court for [the] removal [of a judge]," id. at 142, 889 P.2d at 177. In Castellano, we were asked to construe N.M. Const. art. VI, § 34 (as amended 1994), which defined "vacancy" for purposes of convening a judicial nominating commission, as limiting the ways in which a judicial office became vacant to those specified in that section. Because Article VI, § 34 did not list removal by this Court, we were asked to determine that after the adoption of merit selection, this Court no longer had the power to remove a judge on the Commission's petition. Castellano, 119 N.M. at 142, 889 P.2d at 177. We concluded that the absence of a reference to this Court's power within the text of Article VI, § 34 should be taken into account but that the absence of a reference was inconclusive, "because other portions of the Constitution fill any gap and otherwise make the legislative intent clear." Id. at 143, 889 P.2d at 178. We described this Court's authority as "powers of removal, on petition by the Judicial Standards Commission or under [our] superintending control," and characterized both as "alternative and cumulative with the legislature's power of removal by impeachment," based on the text of Article VI, § 32. Id.
{60} At one time, the Legislature had provided for removal of a magistrate judge other than by impeachment or by this Court. NMSA 1978, § 35-7-2 (repealed 1997) required the Director of the Administrative Office of the Courts to suspend a magistrate's certificate of qualification under certain circumstances. Section 35-7-2 also provided that the magistrate judge was entitled to appeal the suspension to the district court of Santa Fe County. Section 35-7-2 further provided, if the suspension was upheld on appeal or if the magistrate judge failed to appeal the suspension order, for the revocation of the certificate of qualification and for certification of a vacancy to the Governor. In 1997, a constitutional amendment was proposed to add a magistrate judge to the Judicial Standards Commission, which amendment was approved in 1998. See 1997 N.M. Laws, S.J.R. No. 5, § 1.
{61} Based on the text of Article VI, § 32, as we have construed it, and the history of amendments to it, the Commission now provides the primary administrative support for the exercise of this Court's historic powers and responsibilities with respect to the removal of all judges. Although the text of this constitutional provision indicates that we have "powers of removal," as a practical matter ordinarily a complaint about a judge will begin as a pleading filed with the Commission, *212 rather than this Court, and we will provide appellate review of the Commission's findings and conclusions. The structure provided by the Constitution is systematic and for the most part contained within the text of Article VI, § 32.
{62} Article VI, § 32 provides for investigation, for a hearing before the Commission or before three masters, who must be judges or justices of courts of record, and for a recommendation after the hearing before the Commission or after a review of the record and the masters' findings, if there is "good cause." Under Article VI, § 32, this Court "shall review the record of the proceedings on the law and facts and may permit the introduction of additional evidence, and it shall order the discipline, removal or retirement as it finds just and proper or wholly reject the recommendation." The Commission "shall promulgate regulations establishing procedures for hearings under this section," which it has done. See generally Judicial Standards Commission Rules 1 to 38 NMRA 2003. We have adopted rules governing our appellate review of Commission proceedings. See generally Rules 27-101 to 27-403 NMRA 2003 ("Rules Governing Review of Judicial Standards Commission Proceedings").
{63} In Castellano, which we heard before we had adopted rules governing our review of Commission proceedings but after the Commission had adopted rules governing its own proceedings pursuant to the authority vested in the Commission by Article VI, § 32, we reviewed the findings and conclusions of the Commission to determine whether the findings were supported by clear and convincing evidence of judicial misconduct. See Castellano, 119 N.M. at 149, 889 P.2d at 184. In doing so, we gave deference to those charged by Article VI, § 34 with the obligation of finding facts. Id. at 149-50, 889 P.2d at 184-85. In reviewing the recommendation by the Commission for removal, we noted that the question of whether the findings supported a determination of judicial misconduct was separate from the issue of whether removal was an appropriate discipline. Id. at 150, 889 P.2d at 185. We appear to have reviewed the findings and conclusions in much the same manner as we would have reviewed those of a district judge, while reserving for ourselves the ultimate decision of what discipline should be imposed. The rules we have adopted for reviewing Commission proceedings restate our discretion to "accept, reject or modify" the findings and conclusions of the Commission, Rule 27-401(A)(1) NMRA 2003, to "impose the discipline recommended by the [C]ommission" or any other that seems appropriate, Rule 27-401(A)(3), and to remand for additional evidence, Rule 27-401(A)(8).
{64} The administrative support that the Constitution provides seems to facilitate this Court's powers and obligations of superintending control, in the same way that the Legislature has often provided administrative support for the Governor's powers and obligations. Absent a staff charged with and funded for investigation and presentation of evidence, and absent a process for factfinding, we would be ill-equipped to pursue complaints as a matter of original jurisdiction. Section 35-7-2, adopted in 1968 and since repealed, and Article VI, § 32, proposed in 1967 and approved at a special election the same year, indicate to me a legislative concern that as a practical matter this Court needed more and different support in supervising the discipline of judges. Our precedent and our rules support a conclusion that the Commission has become an integral part of the Judicial Branch. It is as independent of us as is consistent with our ultimate responsibility under the Constitution.
{65} The primary argument in favor of the writ has been that removal of the prior Governor's appointees before the end of their terms is inconsistent with the general principle that the three branches of government enjoy unique powers and responsibilities and that, generally, each branch is entitled to operate independently of the other in connection with the unique powers and responsibilities entrusted to that branch. See N.M. Const. art. III, § 1 (as amended 1986) (describing the powers of government as divided into "three distinct departments"). That argument is premised on the view that the Commission is part of the judicial branch, and that removal of all of the prior Governor's *213 appointees before the end of their terms, that being a majority of the Commission, would infringe upon the unique powers and responsibilities of the judicial branch. See State ex rel. Clark v. Johnson, 120 N.M. 562, 574, 904 P.2d 11, 23 (1995) (discussing the inquiry into whether and how much the action of one branch disrupts the work of another).
{66} The primary argument against the writ has been that Article V, § 5 authorizes the removal of any officer appointed by the Governor, except as otherwise as provided by law, and thus that granting the writ would infringe upon the unique powers and responsibilities of the executive branch. In fact, this argument, like the argument in favor of the writ, depends on the principle we sometimes refer to as the separation of powers. Those who have advanced this position contend that denying the Governor the power of removal is equally inconsistent with the general principle that the three branches of government enjoy unique powers and responsibilities and that, generally, each branch is entitled to operate independently of the other in connection with the unique powers and responsibilities entrusted to that branch. See N.M. Const. art. III, § 1.
{67} In making this argument, counsel have recognized that Article VI, § 32 provides for appointment of a minority of members of the Commission as "provided by law," for a majority of members of the Commission to be appointed by the Governor as "provided by law," and that the Legislature in implementing this constitutional provision made no provision for removal. See NMSA 1978, §§ 34-10-1 to -2. Nevertheless, counsel have reasoned that until the Legislature, in implementing Article VI, § 32, has expressly limited the Governor's power of removal, the power of removal included in Article V, § 5 should be construed to include a power to remove the Governor's appointees to the Commission, which power is unrestricted.
{68} The arguments against the writ appear to equate the Commission with an agency of the Executive Branch, charged with following the policies of the Governor in executing either duties imposed upon that agency by statute or responsibilities and duties inherent in the office of the Governor. Yet no one has identified a policy-making function of the Commission that the power of removal would serve. The arguments against the writ require a construction of both Article V, § 5 and Article VI, § 32 that seems inconsistent with the purposes those provisions serve.
{69} We noted in Board of Education of Carlsbad Municipal Schools v. Harrell, 118 N.M. 470, 882 P.2d 511 (1994), however, that "[t]he judiciary . . . must maintain the power of check over the exercise of judicial functions by quasi-judicial tribunals in order that those adjudications will not violate our Constitution. The principle of check requires that the essential attributes of judicial power, vis-a-vis other governmental branches and agencies, remain in the courts." Id. at 484, 882 P.2d at 525. In Harrell, this Court decided that when the Legislature had assigned adjudicative responsibilities to an administrative tribunal and limited an aggrieved party's right of appeal to compulsory arbitration, we would "use due-process analysis to determine whether the judicial review provided in the compulsory arbitration statute is adequate to reserve ultimate judicial power to the judiciary." Id. We concluded that the statute unduly restricted judicial review of the decision of the arbitrator and thus to that extent "violate[d] due process and the constitutional allocation of judicial power to the judiciary." Id. at 486, 882 P.2d 527.
{70} In this case the Constitution itself has allocated to this Court responsibilities for reviewing the work of the Commission, which work is alternative and supplemental to our original jurisdiction, and the provision making that allocation has been placed in the section of the Constitution that generally allocates responsibilities to the judicial branch. I think the arguments against the writ are inconsistent with the allocation of responsibilities to the judicial branch and because it would result in changing so many members of the Commission at once would as a practical matter disrupt the activities of the Commission. As an entity that has had limited resources with which to discharge its responsibilities, *214 such a disruption seems particularly unfortunate.
{71} In addition, because Article VI, § 32 characterizes appointments to the Commission as being made as "provided by law," Sections 34-10-1 to -2 seem more relevant than the provisions of Article V, § 5. The Constitution seems to limit the appointment power as provided by statute. There being no specific provision for removal by any appointing power, I would construe Section 34-10-2 as providing for the appointment process to begin again only when the Commission itself certifies that a vacancy exists. That seems to be consistent with the independent character of the Commission and what we might perceive to be the responsibilities of the Dean of the Law School in convening a judicial nominating commission under N.M. Const. art. VI, § 35 (1988).
{72} I note that Article VI, § 35 uses the same phrase "[i]f a position on the commission becomes vacant for any reason," in describing the nomination commissions as is used in describing the Judicial Standards Commission. In the case of the nomination commissions, however, as a matter of custom, each nominating commission has been convened anew, and the various appointing authorities have been asked by the Dean to resubmit nominations as a judicial vacancy has occurred. Consequently, the use of the same phrase in both sections of Article VI provides no guidance on the meaning of the phrase.
{73} In the end, however, the relevant provisions as they have been implemented seem to me to be in harmony. "Residual governmental authority should rest with the legislative branch rather than the executive branch." Clark, 120 N.M. at 575, 904 P.2d at 24. To the extent Article VI, § 32 must be implemented other than by rules promulgated by the Commission or by this Court, it is the task of the Legislature. Section 34-10-2 seems to address the question of whether there is at present a vacancy for the Governor to fill. Article V, § 5, if relevant to the issue, seems to me to direct us first to Article VI, § 32, which in turn, probably directs us to Sections 34-10-1 to -2. Because that statute authorizes the Commission to certify a vacancy, I believe there is at present no vacancy for the Governor to fill. The arguments against the writ are, in effect, arguments for an implied power to remove the prior Governor's appointees and thus intrude on what appears to be the Legislature's prerogative under the Constitution to provide for the appointment process.
{74} "[W]e must never forget that it is a constitution we are expounding." McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579 (1819) (Marshall, C.J.). When the text is not clear, we do have to consider the likely intent of those who proposed and those who approved constitutional language. There may be differences in the way we construe constitutional provisions and the way we construe statutes. We do have to construe both, and any mistakes we make in construing the Constitution itself cannot be corrected by the Legislature by enacting a statute, but rather will require a constitutional amendment. If we are uncertain about the proper construction of a constitutional provision, it makes sense to me to adopt the construction that is more likely to have been the intention of those responsible for including it, rather than requiring that the Constitution be amended in order for that intention to be effectuated.
{75} If construction is necessary, in this case, it seems more likely to me that those who proposed and those who approved the relevant language meant to provide continuity and the stability and institutional memory that continuity tends to ensure. It also seems more likely to me that the Governor's appointment power was perceived, given the functions of the Commission, to be analogous to his power to appoint judges and thus, in all likelihood, to be limited to appointment, rather than removal. That would be consistent with the reference within Article VI, § 32 to only the appointment power in the case of a vacancy. That would be analogous to the appointment power of the Governor in the event of a judicial vacancy.
{76} As we noted in Castellano, the absence of language within a constitutional provision needs to be taken into account in construing a provision, but it is not conclusive, and when the gap is otherwise filled and *215 the intent of the language is clear, we can be confident in construing the language notwithstanding the absence of specific language. 119 N.M. at 143, 889 P.2d at 178. In the end, I am not persuaded that Article V, § 5 was meant to give powers to the executive extending beyond that branch of government. In context and in light of the likely intent of those who drafted the relevant provisions, the arguments in favor of the writ are more persuasive to me than the arguments offered in opposition to the writ. As in Castellano, the relevant provisions seem to me, when considered as a whole, to require this Court to grant the writ. A majority of this Court being of a different opinion, I respectfully dissent.
I CONCUR: RICHARD C. BOSSON, Justice.
NOTES
[1] We will not speculate on this Governor's motive for removing all six executive appointees at one time, although we observe that he is certainly not the first executive to wish to bring in personnel "of [his] own selection." See Wiener v. United States, 357 U.S. 349, 350, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958) (explaining rationales given by Presidents Roosevelt and Eisenhower in attempting to remove personnel appointed by prior administrations).
[2] Potentially, the Legislature could act to impeach a Commissioner if a particularly egregious situation arose. See N.M. Const. art. IV, § 36 ("All state officers . . . shall be liable to impeachment for crimes, misdemeanors and malfeasance in office. . . .").
[3] For that reason, Justice Minzner's concern about constitutional amendments is unwarranted.